**Roger George FLITTIE, Appellant,**

v.

**Herman SOLEM, Warden, South Dakota State Penitentiary; and Mark V. Meierhenry, Attorney General, State of South Dakota, Appellees.**

No. 84–1248.

United States Court of Appeals,
Eighth Circuit.

Submitted April 30, 1985.
Decided Oct. 14, 1985.

934

David R. Gienapp, Madison, S.D., for appellant.

Jeffrey P. Hallem, Pierre, S.D., for appellees.

Before LAY, Chief Judge, HEANEY, Circuit Judge, BRIGHT, Senior Circuit Judge, ROSS, McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG, and BOWMAN, Circuit Judges, En Banc.

JOHN R. GIBSON, Circuit Judge.

Roger Flittie, following the beating death of his stepmother, Ruth Flittie, was convicted in South Dakota state court of conspiracy to commit murder but acquitted of the charge of murder. After a second trial based on the same events, Flittie was convicted as an accessory after the fact to murder. Flittie brought this habeas corpus petition under 28 U.S.C. § 2254 (1982) challenging his second conviction. He claimed his conviction of conspiracy to commit murder and acquittal of murder barred his trial on the accessory charge under double jeopardy and collateral estoppel theories. He further argued that the admission of a videotape recording of a discussion between him and a government informer violated his constitutional rights. A divided panel of this court affirmed the judgment of the district court[1] denying Flittie relief. *Flittie v. Solem,* 751 F.2d 967 (8th Cir. 1985). We granted rehearing en banc to consider whether the panel correctly ruled on these issues. We now affirm the judgment of the district court.

The original information charged Flittie and Tommy Downs with murder[2] and con-

---

1. The Honorable John B. Jones, United States District Judge for the District of South Dakota.

2. The information charged that the defendants jointly, willfully, intentionally and feloniously, on or about the 10th day of October, 1975, with malice aforethought, and without authority of law, and with premeditated design, and without justifiable or excusable cause, [did] perpetrate and effect the death of RUTH K. FLITTIE in her home situate in the City of Brookings, County of Brookings, State of South Dakota; in that the said TOMMY EDWARD DOWNS did, then and there, brutally beat the said RUTH K. FLITTIE on and about her head with a blunt instrument, thereby causing injuries to the said RUTH K. FLITTIE, said injuries causing and resulting in the death of the said RUTH K. FLITTIE; and the said ROGER GEORGE FLITTIE did aid and abet the said TOMMY EDWARD DOWNS to commit the said killing, and did so by the offer of compensation and assistance to the said TOMMY EDWARD DOWNS and said Defendants did then and there and by said means commit the offense of Murder as defined by SDCL 22–16–4.
1st Trial Record at 21.

spiracy to commit murder.[3] The charges arose from the death of Flittie's stepmother on October 10, 1975. Downs pleaded guilty to murder and received a life sentence. On April 26, 1978, a jury convicted Flittie on the conspiracy charge and acquitted him of murder. Eight months later, Flittie was charged with first-degree burglary and accessory after the fact to murder.[4] After considering evidence substantially similar to that presented in the first trial, the jury convicted Flittie on both charges. On appeal, a divided panel of the South Dakota Supreme Court reversed the burglary conviction on collateral estoppel grounds. The accessory conviction was upheld. *State v. Flittie*, 318 N.W.2d 346, 348–49 (S.D.1982).

The evidence at both trials showed that Flittie hired Downs to kill his stepmother and make her death look like an accident.[5] Roger Flittie obtained a key to his mother's house from his brother, Bruce, and through Willie Harris delivered the key and a diagram of the house to Downs. Downs testified that he entered Ruth Flittie's residence and struck her twice with a lamp. Flittie was on a hunting trip at the time of the murder. Downs stated that Harris later gave him $200 and told him to go to Tucson, where arrangements would be made to take care of his expenses. Downs and his companion, Lori Kaprelian, traveled to Tuc-

son and contacted one of Flittie's friends, Larry Brandon. Several money orders were sent to Brandon by Flittie; they were cashed and the proceeds given to Kaprelian. Several other money orders were sent to Tucson and picked up by Kaprelian. At the second trial, Downs testified that he was finally paid $6,000 to $7,000 of the $10,000 he had been promised by Flittie, but that the money Flittie sent to Tucson was not a part of this payment.

## I.

▮▮▮ The fifth amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V; *see also Benton v. Maryland*, 395 U.S. 784, 794–96, 89 S.Ct. 2056, 2062–63, 23 L.Ed.2d 707 (1969) (double jeopardy clause applied to the states). The Supreme Court has recognized three situations that implicate double jeopardy concerns: retrial for the same offense following acquittal; retrial for the same offense after conviction; and multiple punishments for conviction of a single offense. *Illinois v. Vitale*, 447 U.S. 410, 413, 415, 100 S.Ct. 2260, 2263, 2264, 65 L.Ed.2d 228 (1980); *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2089, 2096, 23 L.Ed.2d 656 (1969). In addition, the fifth amendment embodies the federal rule of collateral estoppel. *Ashe v. Swen-*

3. The information charged that the defendants [d]uring the weeks immediately preceding the 10th day of October, 1975, and thereafter until on or about the 10th day of May, 1976, [did] willfully, intentionally, conjointly and feloniously conspire with each other to commit the crime of Murder in violation of SDCL 22-16-4, in that said ROGER GEORGE FLITTIE and the said TOMMY EDWARD DOWNS did conspire and plan the taking of the life of one RUTH K. FLITTIE, mother of the Defendant, ROGER GEORGE FLITTIE, thereby enabling the said ROGER GEORGE FLITTIE to inherit from his mother's estate and that pursuant to said plan, the said Defendant ROGER GEORGE FLITTIE agreed to pay the said TOMMY EDWARD DOWNS for the killing of his mother.
   1st Trial Record at 20.

4. The information charged that:
   On or about and after the 10th day of October, 1975, in the County of Brookings, State of

South Dakota, ROGER GEORGE FLITTIE did commit the public offense of being an Accessory to Murder (SDCL 22-3-5) in that said ROGER GEORGE FLITTIE did feloniously, after the commission of a felony, to-wit: Murder, aid and conceal one Tommy Edward Downs, with knowledge that said Tommy Edward Downs had committed said murder and with the intent that said Tommy Edward Downs would avoid and escape from arrest, trial, conviction, and punishment.
   2d Trial Record at 46.

5. Prior to the second trial, the judge ruled that the state would not be permitted to "go into the fact that Roger Flittie hired [Downs] to go up [to Brookings] to murder his mother." 2d Trial Transcript at 21. The state was permitted to and did prove, however, that Downs was hired to go to Brookings for some purpose and that a murder was committed there.

*son,* 397 U.S. 436, 442–43, 90 S.Ct. 1189, 1193–94, 25 L.Ed.2d 469 (1970).

### A.

■ The first question is whether Flittie's acquittal of the murder charge or conviction on the conspiracy charge prevented a trial on the accessory count. The second trial was permissible if neither murder nor conspiracy to murder is the "same offense" as accessory to murder. Two offenses are not the same if one requires proof of a fact that the other does not. *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). This test focuses on the statutory elements of the offenses, rather than the evidence presented at trial, *Illinois v. Vitale,* 447 U.S. 410, 416, 100 S.Ct. 2260, 2265, 65 L.Ed.2d 228 (1980), and applies "notwithstanding a substantial overlap in the proof offered to establish the crimes." *Iannelli v. United States,* 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 1293 n. 17, 43 L.Ed.2d 616 (1975). *See* Note, *The Double Jeopardy Clause as a Bar to Reintroducing Evidence,* 89 Yale L.J. 962, 966 (1980).

■ There can be no doubt that murder and accessory to murder are not the same offense. While the former requires proof that the defendant kill another human being, the latter only requires evidence that the defendant knowingly has rendered assistance to one who has committed such a killing. *Compare* S.D.Codified Laws Ann. § 22–16–4 (1979) (murder) *and* note 1 *supra with id.* § 22–3–5 (accessory) *and* note 3 *supra.* Similarly, conspiracy to commit murder is not the same offense as accessory to murder. *Compare* § 22–3–5 *and* note 3 *supra with id.* § 22–3–8 (conspiracy) *and* note 2 *supra.* Conspiracy requires

proof of an agreement; a defendant may render assistance to a felon without necessarily having reached an agreement to commit a felony. *See State v. Johns,* 184 Conn. 369, 378–79, 439 A.2d 1049, 1053–54 (1981). Thus, under *Blockburger* and *Vitale,* acquittal of the murder charge and conviction on the conspiracy charge did not prevent a second prosecution on the accessory count.[6]

The jury charges in both prosecutions, enumerating the elements of these crimes, highlights this conclusion. *Cf. Garrett v. United States,* — U.S. —, 105 S.Ct. 2407, 2415–16, 85 L.Ed.2d 764 (1985) (proper analysis of successive prosecution issue requires examination of not only statutes but also specific charges constituting basis of prosecutions). A conviction of conspiracy required a finding that Flittie and another had conspired to commit murder and that an overt act was committed by one of them. A murder conviction required findings that Flittie as an accomplice caused the infliction of an injury from which Ruth Flittie died, and that he did so with premeditated design to effect the death. Conviction as accessory after the fact required findings that Flittie concealed or aided Downs after the murder knowing that Downs had murdered Ruth Flittie and that he did so with the intent that Downs avoid arrest, trial, conviction or punishment.

The statutes and jury charges make evident that conspiracy involves an agreement to commit an offense that of necessity must be pre-offense, and that conduct punished as conspiracy is quite different from concealing or assisting a person post-felony. It is true that a conspiracy charge may be proved, as in this case, by evidence

---

**6.** Flittie maintains that the double jeopardy clause was violated by the trial court's refusal to instruct the second jury that Flittie had been found not guilty of murdering Ruth Flittie. No authority is offered to support this argument. The omission of an instruction is grounds for habeas relief only if it infected the whole proceeding such that the defendant was denied a fair trial. *Tyler v. Wyrick,* 635 F.2d 752, 753 (8th Cir.1980) (per curiam), *cert. denied,* 452 U.S. 942, 101 S.Ct. 3089, 69 L.Ed.2d 958 (1981).

The absence of the proferred instruction did not deprive Flittie of a fair trial. Considerable evidence was presented concerning the murder because the state had to prove the event to sustain the accessory charge. The state never contended, however, that Flittie murdered his mother in the sense that he was present at the scene and beat her to death. Thus, there was no error in refusing to instruct the jury that Flittie was not guilty of murder.

of overt acts that occurred after the underlying felony. Looking only to the evidence at trial, however, is misleading. The elements of the two crimes are substantially different. Each charge requires proof of an additional fact which the other does not. Conspiracy does not require a finding of aid and concealment. Accessory after the fact does not require a finding of agreement. While the proof offered to establish the crimes may overlap, the crimes are separate and distinct.[7] *See Iannelli*, 420 U.S. at 785 n. 17, 95 S.Ct. at 1293 n. 17.

The Supreme Court in *Vitale* left open the possibility that under certain circumstances, two offenses might be considered the "same offense," despite dissimilar statutory elements, where the same evidence proves both offenses. 447 U.S. at 419–20, 100 S.Ct. at 2266–67. *Vitale* held that a second prosecution was not automatically barred by the double jeopardy clause because the defendant's failure to slow, which was the basis of the first prosecution, was not *necessarily* a lesser included offense of involuntary manslaughter, the charge in the second prosecution; the two offenses would be "the same" only if the reckless conduct required for the manslaughter charge was always a failure to slow. *Id.* The Court did suggest, however, that if the manslaughter conviction actually rested on proof of a failure to slow as the reckless conduct, the defendant's

double jeopardy claim would be "substantial." *Id.* at 421, 100 S.Ct. at 2267.

*Vitale* does not suggest that it is necessarily a constitutional violation to offer the same evidence at a second prosecution. The Court was concerned that the same evidence would be offered at retrial solely to prove conduct that was a necessary element of the offense of which the defendant had already been convicted. The Court, therefore, saw the issue as whether, in retrospect, the state had merely proven a lesser (or greater) included offense.[8] *See id.* at 420–21, 100 S.Ct. at 2267 (citing *Harris v. Oklahoma*, 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977); *Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977)).

In the present case, the conduct punished by the second prosecution was hiding Downs and providing him with aid to avoid detection. Evidence of this conduct was introduced at the first trial, along with evidence of the defendant's acts before the murder, to prove that there was a conspiracy to murder. The defendant's conduct after a crime may well be relevant to prove an agreement made before the crime. This conduct, however, was not a necessary element of the conspiracy charge—the basis of that charge was the defendant's premurder conduct. Therefore, these two offenses, although proved by much the same evidence, required proof of different ele-

7. Our resolution of the question whether these statutory provisions are the "same offense" under *Blockburger* necessarily decides any question of legislative intent. *See Garrett*, 105 S.Ct. at 2411. In *Garrett*, the same "single act" for which the petitioner was first convicted served as partial proof of his violation of the second offense. It was therefore necessary to determine if Congress had intended that the same act be punished under two separate offenses or if it had intended that the provisions be substitutes for one another, before proceeding to the constitutional question. In the present case, we deal with more than a "single act", *cf. id.* 105 S.Ct. at 2416–17, and it seems obvious that the legislature did not intend murder or conspiracy to murder to be merely a substitute or exclusive alternative for accessory after the fact.

8. Judge Arnold argues that because the conspiracy charge included post-murder conduct, the

accessory charge constitutes a lesser included offense. He concludes that Flittie was prosecuted twice for the same conduct, only the label having changed, as post-murder conduct was one of the elements of conspiracy. This reasoning overlooks the fact that conspiracy and accessory after the fact each includes an element that the other does not. Even though post-murder conduct may, under the unique circumstances of this case, have been evidence relevant to the conspiracy, the conspiracy charge required proof of an agreement to commit the murder. The accessory after the fact charge did not. Similarly, post-felony concealment, a required element of the accessory after the fact charge, was not part of the conspiracy charge. Judge Arnold's argument based on *Vitale*, and its emphasis on the lesser included offense, thus contains a critical weakness.

ments and penalized different conduct. *Vitale* does not bar successive prosecutions of these offenses.

**B.**

■ Initially developed in civil cases, the doctrine of collateral estoppel dictates that an issue of ultimate fact determined by a valid final judgment cannot be litigated again between the same parties. *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970).[9] The following test is applied in criminal cases:

> Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration."

*Id.* at 444, 90 S.Ct. at 1194 (quoting Mayers & Yarbrough, Bis Vexari: *New Trials and Successive Prosecutions*, 74 Harv.L.Rev. 1, 38–39 (1960)).

Flittie argues that collateral estoppel should have prevented trial on the accessory count. The panel held that any preclusive effect must flow from Flittie's acquittal on the murder charge, reasoning that the conviction on the conspiracy charge could not bar later proceedings by the state because the *Ashe* rule refers only to acquittals. 751 F.2d at 971. The court relied on cases in this circuit that have held collateral estoppel to be a good defense only as to ultimate issues determined at the first trial in the defendant's favor. *See United States v. DeCoteau*, 516 F.2d 16, 18 (8th Cir.1975); *United States v. Friedman*, 506 F.2d 511, 517 (8th Cir.1974), *cert. denied*, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975); *Moton v. Swenson*, 488 F.2d 1060,

1062–63 (8th Cir.1973), *cert. denied*, 417 U.S. 957, 94 S.Ct. 3086, 41 L.Ed.2d 675 (1974); *United States v. Haley*, 452 F.2d 398, 404 (8th Cir.1971), *cert. denied*, 405 U.S. 977, 92 S.Ct. 1205, 31 L.Ed.2d 253 (1972); *Percy v. South Dakota*, 443 F.2d 1232, 1235 (8th Cir.), *cert. denied*, 404 U.S. 886, 92 S.Ct. 223, 30 L.Ed.2d 169 (1971); *Fernia v. United States*, 340 F.2d 837, 839 (8th Cir.), *cert. denied*, 381 U.S. 902, 85 S.Ct. 1446, 14 L.Ed.2d 284 (1965).

On rehearing, however, Flittie argues that the court en banc should hold that collateral estoppel must be applied to bar relitigation of ultimate facts that have been decided in the government's favor in a prior trial. He urges that we reject the long line of precedents adverse to this position on the ground that these cases were wrongly decided.

■ We find no support for Flittie's argument. To the contrary, all relevant Supreme Court decisions support the panel's holding. First, *Ashe* itself strongly implies that collateral estoppel is invoked only upon a prior acquittal. The Court stated: "The single rationally conceivable issue in dispute before the jury was whether the petitioner had been one of the robbers. And the jury by its verdict found that he had not. The federal rule of law, therefore, would make a second prosecution * * wholly impermissible." 397 U.S. at 445, 90 S.Ct. at 1195. Under Flittie's theory, it would have been unnecessary for the Court to relate the fact of prior acquittal; the mere presence of the issue before the jury would have been enough to invoke estoppel. This mention of the fact of acquittal implies that it was necessary to the result. Later in the opinion, the Court observed that the fifth amendment "protects a man who has been acquitted from having to 'run the gauntlet' a second time." *Id.* at 446, 90 S.Ct. at 1195 (quoting *Green v. United*

---

9. In *Ashe,* six men had been robbed by four individuals. The defendant was acquitted of robbing one of the victims. He was then indicted for robbing one of the other six men. The Supreme Court held that the first acquittal was based on the jury finding that the defendant had not participated in the robbery. Because the ultimate fact of participation was resolved in the defendant's favor at the first trial, collateral estoppel precluded retrial of that fact. 397 U.S. at 446, 90 S.Ct. at 1195.

*States,* 355 U.S. 184, 190, 78 S.Ct. 221, 225, 2 L.Ed.2d 199 (1957)).[10] Finally, the facts in *Ashe* concerned a prior acquittal. If anything in the decision intimates that prior convictions invoke estoppel, it is dictum.[11]

Finally, the only express mention of this issue in *Ashe* is unfavorable to Flittie. In a concurring opinion joined by two members of the Court, Justice Brennan stated flatly: "[O]f course, collateral estoppel would not prevent multiple prosecutions when the first trial ends in a verdict of guilty." 397 U.S. at 459 n. 13, 90 S.Ct. at 1209 n. 13 (Brennan, J., concurring).

Many Supreme Court decisions applying estoppel do so in the context of prior acquittals. We have found none, however, that involve convictions and estoppel. *See, e.g., One Lot Emerald Cut Stones v. United States,* 409 U.S. 232, 93 S.Ct. 489, 34 L.Ed.2d 438 (1972); *Turner v. Arkansas,* 407 U.S. 366, 92 S.Ct. 2096, 32 L.Ed.2d 798 (1972); *Harris v. Washington,* 404 U.S. 55, 92 S.Ct. 183, 30 L.Ed.2d 212 (1971); *Simpson v. Florida,* 403 U.S. 384, 91 S.Ct. 1801, 29 L.Ed.2d 549 (1971); *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). The Court addressed this issue in *Sealfon v. United States,* 332 U.S. 575, 68 S.Ct. 237, 92 L.Ed. 180 (1948). The accused had been acquitted of conspiring to defraud the government. He was retried on the underlying substantive offense. No double jeopardy attached because the two offenses were not the same. The Court recognized, however, that collateral estoppel could apply to successive criminal prosecutions for different offenses. The only issue was framed as "whether the jury's verdict in the conspiracy trial was a determination *favorable to petitioner* of the facts essential to conviction of the substantive offense." *Id.* at 578–79, 68 S.Ct. at 239 (emphasis added).[12] The court found that a favorable determination had been made and invoked estoppel. This case has been interpreted, and correctly so, to require an acquittal before estoppel is invoked. *See, e.g., Haley,* 452 F.2d at 404; *United States v. Cowart,* 118 F.Supp. 903, 906 (D.D.C. 1954).

Finally, any doubt left after *Sealfon* was resolved in *United States v. Williams,* 341 U.S. 58, 71 S.Ct. 595, 95 L.Ed. 747 (1951). *Williams* involved a defendant who raised a defense of estoppel based on a prior conviction. The Court responded: "[Williams] can, of course, claim no bar against prosecution on a theory of estoppel since the facts in the former trial, if applicable to the subsequent one, were found against him." *Id.* at 64 n. 3, 71 S.Ct. at 598 n. 3. This case plainly shows that Flittie's argument is without merit. *See* C. Whitebread, *Criminal Procedure* § 24.04, at 509 (1980) ("Only when ultimate issues are *positively* resolved in the defendant's favor at the previous trial (e.g. there is an acquittal)

---

**10.** Other passages show that acquittal was the keystone to the Court's opinion. *See, e.g.,* 397 U.S. at 447, 90 S.Ct. at 1196 (expressing concern over State's concession that "following the petitioner's acquittal, it treated the first trial as no more than a dry run for the second prosecution").

**11.** The same is true of language in *United States v. Oppenheimer,* 242 U.S. 85, 37 S.Ct. 68, 61 L.Ed. 161 (1916), to the effect that a prior adjudication may be pleaded as a bar "whether it takes the form of an acquittal or conviction." *Id.* at 88, 37 S.Ct. at 69 (quoting *Reg. v. Miles,* 24 Q.B.D. 423, 431). The facts in *Oppenheimer* involved a prior acquittal. Moreover, the language from *Miles* does not support Flittie's position even if we were bound by dictum. The court there referred to final adjudication of a *charge* as invoking a bar; there is no mention of ultimate fact issues supporting a bar. This rea-

soning is consistent with double jeopardy law as we understand it: if an accused is retried on the same *offense,* double jeopardy applies whether the prior adjudication resulted in acquittal or conviction. If, however, the same offense (or "charge") is not involved, estoppel applies only if the prior adjudication resulted in acquittal. Expanding estoppel to follow conviction would read the "same offense" language out of the fifth amendment and substitute "same issue" or "same ultimate fact." We decline to do this.

**12.** *Sealfon* did not arise in a constitutional context, for it was decided before *Ashe* held that the fifth amendment embodied collateral estoppel. It is no less instructive for this reason, though. *See Ashe,* 397 U.S. at 444, 90 S.Ct. at 1194 (adopting *Sealfon* test to determine whether issue was necessarily decided in the prior adjudication).

does collateral estoppel apply as it is traditionally interpreted.") (footnote omitted); Note, *supra* p. 937, at 973 ("The irony is that while criminal collateral estoppel is rooted in the barren clay of acquittals, it is fenced off from the fertile soil of convictions.").[13]

■ Thus, the issue narrows to whether the jury which acquitted Flittie of murder rationally could have grounded its verdict on an ultimate fact essential to an accessory conviction. The acquittal on the murder charge implied that the jury resolved some issues in Flittie's favor. Under *Ashe*, then, the next step is to determine what issues were resolved in Flittie's favor and whether any of these issues are elements of the accessory charge.

We begin by examining the charges to the juries. In the first trial, Flittie was convicted of conspiracy. The jury had to find that: (1) two or more persons conspired to commit murder; (2) one of these persons was Flittie; and (3) either Flittie or his conspirator committed an overt act to effect the object of the conspiracy.

To find Flittie not guilty of murder, the first jury had to find that one or more of the following elements were not proven beyond a reasonable doubt: (1) Flittie as an accomplice caused to be inflicted an injury or injuries upon the deceased from which the deceased died; (2) Flittie did so with premeditated design to effect the death of the deceased; and (3) the killing was without authority of law and without justification.

To convict Flittie as an accessory after the fact, the second jury had to find that: (1) Downs murdered Ruth Flittie; (2) Flittie concealed or aided Downs after the murder; (3) at the time Flittie concealed or aided Downs he knew that Downs had murdered Ruth Flittie; and (4) Flittie concealed or aided Downs with the intent that Downs

would avoid or escape arrest, trial, conviction, or punishment. The South Dakota Supreme Court found the jury that acquitted the defendant on the murder charge "could not have rationally grounded its verdict on an issue other than whether [Flittie] * * * had aided or abetted Downs." 318 N.W.2d at 348.

Flittie argues that the first jury could have decided that his post-murder conduct was sufficient to support a murder conviction, and that the acquittal on the murder charge indicated that the jury found Flittie was not an after-the-fact participant. Consequently, this issue should have been barred in the second trial as resolved in Flittie's favor at the first. This argument is unconvincing. The guilty verdict on the conspiracy charge belies the contention that the first jury thought Flittie was not guilty of after-the-fact participation. The South Dakota Supreme Court found it "evident that the jury in the first trial convicted defendant on the conspiracy charge based on his post-murder conduct." 318 N.W.2d at 349.[14] Even the dissenting justices agreed that the first jury found that Flittie had aided Downs after the murder. *See id.* at 350–51 (Fosheim, J., dissenting).

An instruction from the first trial helps to harmonize the verdicts: "So in this case if you should find beyond a reasonable doubt that Tommy Edward Downs was a principal and Roger George Flittie an accessory *before the fact* to the commission of the murder, the defendant Flittie would be guilty thereof." 1st Trial Record at 119 (emphasis added). The first jury could have found that Flittie had engaged in culpable conduct after the murder and based the conspiracy conviction on this finding. The acquittal on the murder count may rationally reflect the jury's belief that Flittie had not acted as an accessory before the

---

13. There is no convincing contrary analogy to civil estoppel because in a civil case it is doubtful that a party would raise a prior adverse adjudication as a bar against himself.

14. The court noted that: (1) the information on the conspiracy count was based in part on Flittie's overt acts in paying money to Downs after the murder; and (2) "[c]onsiderable evidence" was introduced in the first trial showing that Flittie sent Downs to Tucson and forwarded money to him there. 318 N.W.2d at 349.

fact. A finding that Flittie did not act as an accessory before the fact does not preclude trying him as an accessory after the fact.

## C.

Flittie contends that collateral estoppel should have prevented the trial court from allowing the introduction of any evidence admitted during the first trial. This argument's success depends on whether the *Ashe* doctrine extends to bar relitigation of evidentiary facts.

■ The fact central to this issue is whether Flittie acted as an accessory to the murder before the fact. This fact was an essential (ultimate) fact in the trial on the murder charge. The conviction on the accessory after the fact count, however, did not depend on finding whether Flittie was an accessory before the fact. Thus, the same fact was only evidentiary in the second trial. *See generally* Note, *Collateral Estoppel Effect of Prior Acquittals*, 46 Brooklyn L.Rev. 781, 788–90 (1980) (difference between evidentiary and ultimate facts).

■ The law in this circuit is that collateral estoppel does not bar relitigation of facts that are evidentiary in the second prosecution. *United States v. Riley*, 684 F.2d 542, 546 (8th Cir.1982), *cert. denied*, 459 U.S. 1111, 103 S.Ct. 742, 74 L.Ed.2d 962 (1983); *see King v. Brewer*, 577 F.2d 435, 440–41 (8th Cir.1978), *cert. denied*, 440 U.S. 918, 99 S.Ct. 1238, 59 L.Ed.2d 468 (1979); *United States v. Kills Plenty*, 466 F.2d 240, 243 (8th Cir.1972), *cert. denied*, 410 U.S. 916, 93 S.Ct. 971, 35 L.Ed.2d 278 (1973).[15]

15. The court in the second trial was not insensitive to Flittie's double jeopardy concerns. The following exchange took place in chambers before opening statements:

Well, as we discussed off the record, it's the court's opinion that you cannot go into facts, ultimate facts which were previously determined by a jury in the murder trial of the defendant Roger Flittie, and that you can have your witnesses testify concerning the contacts between the defendant and Tommy Downs and the conversations between them short of the statement by the defendant Roger

## II.

Flittie argues that it was error for the trial court to admit a videotape of a conversation between him and William Harris. Harris was a good friend of Flittie; they had been acquainted for ten years, and it was Harris who had first introduced the defendant to Downs. Prior to December 5, 1977, Harris had been arrested on two forgery charges. On January 9th of the next year, Harris entered into an agreement with state officials that provided for dismissal of the forgery charges. The terms required Harris to cooperate with law enforcement officials in "attempting to illicit [sic] incriminating statements" from Roger Flittie. 2d Trial Record at 94.

That evening, Harris was taken to the state penitentiary to visit the defendant, who was incarcerated on a conviction unrelated to his mother's death. Although not compelled to do so by prison policy or practice, Flittie agreed to see and converse with Harris. The defendant was unaware, however, that Harris and the visiting room had been equipped to make audio and video recordings of the discussion.

During the conversation, Harris made several statements that he conceded at trial were lies. He misrepresented to Flittie that Downs had been requesting more money for his role in the murder and falsely implied that Downs intended to satisfy his demands out of Flittie's property. In response to these false comments and other discussion, Flittie made several arguably incriminating statements. A videotape re-

Flittie that he wanted Downs to go to Brookings to kill his mother. And that you can prove the contact and the furnishing of the key and you can prove the conversations relative to Roger Flittie wanting Tommy Downs to go to Brookings and that the defendant furnished him with maps concerning the location of his mother's house. I think that's about as far as you can go.

2d Trial Transcript at 18. Thus, the trial court may have given Flittie more estoppel protection than the Constitution requires.

cording of these statements was played for the jury.[16]

### A.

■ The first argument is that admission of the tape violated the fourth amendment. Flittie had a full and fair opportunity to litigate this issue in the South Dakota courts. We cannot, therefore, set aside the conviction on this ground. *See Stone v. Powell,* 428 U.S. 465, 494, 96 S.Ct. 3037, 3052, 49 L.Ed.2d 1067 (1976); *Gregory v. Wyrick,* 730 F.2d 542, 543 (8th Cir.1984) (per curiam).

### B.

■ Second, Flittie argues that admission of the tape violated his sixth amendment right to counsel. At the time the tape was made, Flittie was neither under arrest for nor charged with his stepmother's murder. Therefore, he had no sixth amendment right to counsel. *See Brewer v. Williams,* 430 U.S. 387, 398–99, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977); *Massiah v. United States,* 377 U.S. 201, 205, 84 S.Ct. 1199, 1202, 12 L.Ed.2d 246 (1964); *United States v. Grego,* 724 F.2d 701, 702–03 (8th Cir.1984); *United States v. Dobbs,* 711 F.2d 84, 85 (8th Cir.1983). The record shows that the defendant was arrested and charged within several hours after the tape was recorded. Flittie argues that the arrest was delayed solely to deprive him of his *Massiah* rights. Intentional and unnecessary delay by the government in bringing an indictment may invoke the sixth amendment right to counsel. *Dobbs,* 711 F.2d at 85 n. 1 (dictum). This case, however, is not within the *Dobbs* exception to the *Massiah* rule. Although Flittie had become a primary suspect when the tape was recorded, the government's delay was not unnecessary. Prior to the day when the tape was made, law enforcement officials felt that there was not enough evidence to support the charge against Flittie. Most important was the arrest of Downs and his subsequent confession to murdering Ruth Flittie. *See* Suppression Hearing Transcript at 4–5, *South Dakota v. Flittie,* No. 78–2011 (Mar. 30, 1978). Thus, the timing of the arrest is consistent with the accumulation of evidence implicating Flittie. *Cf. Hoffa v. United States,* 385 U.S. 293, 310, 87 S.Ct. 408, 417, 17 L.Ed.2d 374 (1966) ("The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long.").

### C.

■ Flittie's final claim with respect to the tape is that its admission violated fifth amendment guarantees against self-incrimination. The first issue is whether Flittie's *Miranda* rights were violated. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Without reaching the merits of this claim,[17] we con-

---

**16.** In ruling on a motion to suppress the tape, the trial court found:

> That the Defendant, Roger Flittie, was not compelled to see Mr. Harris, but did so voluntarily.
>
> That the Defendant could have refused to meet with Mr. Harris.
>
> That the visit between Mr. William Harris, Jr. and the Defendant lasted approximately fifteen minutes.
>
> That Mr. William Harris, Jr. did not threaten or coerce Mr. Flittie in any manner.
>
> That the Defendant was free to terminate the visit and go back to his cell at any time.

Order Denying Motion to Suppress at 3, *State v. Flittie,* No. 78–2340 (S.D.Cir.Ct. Nov. 19, 1979). These findings are presumed correct. *See Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).

**17.** An argument can be made that Flittie was entitled to *Miranda* warnings. He was in custody and Harris, his one-time friend, deliberately elicited incriminating information from him. The government had entered into a written agreement with Harris and supervised the taping session. *See United States v. Henry,* 447 U.S. 264, 270–73, 100 S.Ct. 2183, 2186–88, 65 L.Ed.2d 115 (1980); *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980); *Mathis v. United States,* 391 U.S. 1, 4–5, 88 S.Ct. 1503, 1504–05, 20 L.Ed.2d 381 (1968); *United States v. Surridge,* 687 F.2d 250, 253–55 (8th Cir.), *cert. denied,* 459 U.S. 1044, 103 S.Ct. 465, 74 L.Ed.2d 614 (1982).

We believe, however, that the confrontation was merely a dialogue between Harris and Flittie. There was no express questioning, and Har-

clude that admission of the tape was harmless beyond a reasonable doubt. "The admission of statements obtained in violation of *Miranda* may constitute harmless error when there remains overwhelming independent evidence as to the defendant's guilt." *United States v. Packer*, 730 F.2d 1151, 1157 (8th Cir.1984) (citations omitted); *see also United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 1979, 76 L.Ed.2d 96 (1983) (reviewing court must consider the record as a whole and ignore errors that are harmless, including most constitutional violations).

Flittie's taped statements were not the key to the state's case. Less than fifteen minutes in length and often inaudible, the tape contained only a few marginally incriminating statements. Most of the statements did not relate to the accessory after the fact charge.

Four different witnesses testified concerning Flittie's aid to Downs after the fact, including Downs, Harris, Kaprelian, and Brandon. Physical evidence, in the form of phone records and cancelled money orders, added support. To counter this evidence, the defendant chose only to attack the credibility of the state's witnesses. It is unlikely that the videotape had a major impact on the jury in determining whether these witnesses were believable. The whole record shows overwhelming independent evidence to support the conviction. *See also Milton v. Wainwright*, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972) (admission of confession related by accused to undercover police officer posing as cellmate found harmless).

■ The second fifth amendment issue is whether the statements were coerced. The tape would be inadmissible unless the

totality of circumstances shows that Flittie's statements were the product of a free and rational choice. *See Greenwald v. Wisconsin*, 390 U.S. 519, 521, 88 S.Ct. 1152, 1153, 20 L.Ed.2d 77 (1968) (per curiam).[18] The basis of any fifth amendment claim must be some kind of compulsion. *Hoffa v. United States*, 385 U.S. 293, 304, 87 S.Ct. 408, 414, 17 L.Ed.2d 374 (1966). Flittie raises a number of grounds to support his coercion claim.

The first is that he was in the South Dakota penitentiary when the statements were taken. The Supreme Court recognized in *Miranda* the compelling pressures upon incarcerated persons. 384 U.S. at 467, 86 S.Ct. at 1624. Flittie was in custody, but on an unrelated matter. Incarceration does not ipso facto make a statement involuntary. *See Cervantes v. Walker*, 589 F.2d 424, 427 (9th Cir.1978). While Flittie may have been constrained within the penitentiary walls, he was not forced to remain in the visitors' room with Harris. Thus, the imprisonment did not produce a coerced statement.

Second, Flittie maintains that Harris's hidden link to law enforcement officials was a form of coercion. At the time of the encounter, Flittie was unaware that Harris was cooperating with the state. The use of a secret informer, however, is not unconstitutional per se. *Hoffa*, 385 U.S. at 311, 87 S.Ct. at 418. "Where a defendant's conversations with an informant are voluntary and the informant's presence was wholly voluntary, admissions made by the defendant do not violate the * * * privilege against compulsory self-incrimination." *United States v. Davis*, 646 F.2d 1298, 1302 (8th Cir.) (footnote and citation omit-

ris received no specific instructions from the government regarding the direction of the conversation. The rationale underlying *Miranda* and its progeny is government compulsion, and we see no such compulsion here. Although we do not reach the merits of this issue, we express no approval of the state's taping scheme. The frustration of the prosecuting authorities is understandable. There is, however, no excuse for this questionable conduct, which might result in reversal in a closer case.

18. If the statements were coerced, their admission could not have been harmless error. *See United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 1977 n. 6, 76 L.Ed.2d 96 (1983); *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967); *Payne v. Arkansas*, 356 U.S. 560, 567–68, 78 S.Ct. 844, 849–50, 2 L.Ed.2d 975 (1958).

ted), *cert. denied,* 454 U.S. 868, 102 S.Ct. 333, 70 L.Ed.2d 170 (1981). Flittie agreed to see Harris of his free will, and he was equally free to terminate the conversation at his pleasure. That the statement was secretly recorded does not itself vitiate the consent. *See id.* at 1300.

Finally, Flittie urges that his responses were coerced because they were prompted by Harris's statements, some of which, Flittie argues, were untruthful and possibly threatening. Misrepresentations on the part of the government do not make a statement per se involuntary. *See Frazier v. Cupp,* 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); *United States ex rel. Galloway v. Fagg,* 403 F.Supp. 248, 252 (S.D.N.Y.1975).

The totality of circumstances shows that Flittie's statements were the product of a free and rational choice. It was not, therefore, a violation of the fifth amendment to admit the videotape.

The judgment of the district court is affirmed.

BRIGHT, Senior Circuit Judge, concurring in part and dissenting in part.

I would reverse the district court and grant the writ on double jeopardy grounds for the reasons set forth by Judge Arnold in his dissenting opinion, except for the first paragraph thereof which deals with the conversation between Flittie and Harris. As to that conversation, I agree with the majority opinion.

McMILLIAN, Circuit Judge, concurring in part and dissenting in part.

I agree with the double jeopardy analysis set forth in the majority opinion. In particular, I agree that the collateral estoppel doctrine set forth in *Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970), applies only to prior acquittals and does not apply to prior convictions.

However, I do not agree with the majority opinion's analysis of the admissibility of the taped conversation between Flittie and Harris. In my opinion admission of this conversation violated Flittie's fifth amendment right against self-incrimination and his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). I therefore join the dissenting opinions of Judge Heaney and Judge Arnold on this issue.

Accordingly, I would reverse the judgment of the district court and grant the petition for writ of habeas corpus.

HEANEY, Circuit Judge, dissenting.

The dissent to the panel opinion is incorporated here by reference, *see* 751 F.2d at 975–77.

The en banc majority reiterates the position that a criminal defendant may only invoke collateral estoppel based upon a prior acquittal. There is no doctrinal explanation for this view in the majority opinion, nor in the cases cited therein. I remain convinced that the prior acquittal requirement is an unintended quirk in the case law and defeats the purpose of the double jeopardy clause and *Ashe.*[1] A party should clearly be able to raise defensively the determination of an issue of ultimate fact from a prior adverse adjudication if it is to his or her advantage in a subsequent proceeding, whether that proceeding is civil or criminal. In this case, the same parties litigated the identical issue concerning Flittie's post-murder conduct a second time, and consequently he was twice-tried and twice-punished for the same offense.

There is an alternative ground supporting Flittie's double jeopardy claim. The Supreme Court has stressed in several recent decisions that whether the same conduct may be prosecuted under separate offenses is a question of legislative intent. *See, e.g., Garrett v. United States,* ——

---

1. I note that this is not a case involving *nonmutual* collateral estoppel, which would involve other complicating factors if extended to criminal cases. *Cf. Standefer v. United States,* 447 U.S. 10, 21–25, 100 S.Ct. 1999, 2006–08, 64 L.Ed.2d 689 (1980) (rejection of aider and abettor's collateral estoppel argument in relation to acquittal of principal).

U.S. ——, ——, 105 S.Ct. 2407, 2411, 85 L.Ed.2d 764, 771 (1985); *Missouri v. Hunter,* 459 U.S. 359, 368, 103 S.Ct. 673, 679, 74 L.Ed.2d 535 (1983). If the court determines that the legislature clearly intended that the same conduct be punished twice under separate offenses, there is no violation of the double jeopardy clause. In *Garrett,* for example, the Supreme Court analyzed the Comprehensive Drug Abuse, Prevention, and Control Act of 1970 and determined that Congress intended that a defendant could be prosecuted for both continuing criminal enterprise and the underlying predicate offense of conspiracy. —— U.S. at ——–——, 105 S.Ct. at 2412–16, 85 L.Ed.2d at 772–76. In this case, it is inconceivable that the South Dakota legislature intended that Flittie's post-murder conduct be punished as both "conspiracy" and "accessory-after-the-fact." Conspiracy is defined in the statute in terms of an agreement to commit an offense in the future, S.D.Codified Laws Ann. § 22–3–8, and accessory-after-the-fact is defined in terms of assistance to another person who has already committed an offense, *id.* § 22–3–5. Under either a legislative intent or collateral estoppel analysis, the state subjected Flittie to double jeopardy.

I also am of the view that the admission of Flittie's conversation with Harris violated the fifth amendment guarantee against self-incrimination and Flittie's rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The majority all but concedes that Flittie's *Miranda* rights were violated, *see supra* n. 17, but contends that the admission of the video tape was harmless error. The majority concludes that the tape contained only a few marginally incriminating statements which did not relate to the accessory-after-the-fact charge. I disagree. I find that the video tape contains numerous incriminating statements which focused almost entirely on Flittie's post-murder conduct and the accessory-after-the-fact charge. As required by his agreement with the

state, Harris misrepresented to Flittie that Downs had been requesting more money for his role in the murder. This exchange was obviously conceived by the state to elicit incriminating statements from Flittie concerning his payments to Downs, and as the following excerpts indicate, it was entirely successful:

I paid him pretty square, as far as I am concerned.

\* \* \* \* \* \*

I don't see how he [Downs] can say anything \* \* \* because he's gonna be the one to get fingered worse than anybody.

\* \* \* \* \* \*

I put out quite a few bucks to get him down to Tucson, to get him out of the area, and \* \* \* I covered for him.

\* \* \* \* \* \*

I know I paid him over seven grand.

\* \* \* \* \* \*

There ain't nothing I can tell him until I get a job or something. I think three [thousand dollars more] is a little \* \* \* high.

\* \* \* \* \* \*

I can't see where he'd be so stupid to risk a \* \* \* murder rap.

Although the state also called several witnesses to testify concerning Flittie's aid to Downs after the murder, I cannot conceive of evidence more damaging in terms of its impact on the jury than Flittie's own admissions on video tape. Certainly this evidence buttressed the rest of the state's case. Thus, admitting the video tape was clearly prejudicial.

Accordingly, I must dissent.

ARNOLD, Circuit Judge, with whom LAY, Chief Judge, and HEANEY, Circuit Judge, join, dissenting.\*

I agree fully with Judge Heaney that the admission of Flittie's conversation with

---

\* Judge BRIGHT joins the portion of this opinion concluding that the Double Jeopardy Clause requires that Flittie's conviction be set aside.

Harris violated the self-incrimination clause of the Fifth Amendment, as interpreted in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Therefore, even if the Double Jeopardy Clause does not bar this prosecution, Flittie is entitled to a new trial.

As to the double-jeopardy argument, I agree with the Court that the collateral-estoppel component of this doctrine applies only when the first trial has ended in an acquittal. See *Ashe v. Swenson,* 397 U.S. 436, 459 n. 13, 90 S.Ct. 1189, 1202 n. 13, 25 L.Ed.2d 469 (1970) (Brennan, J., concurring). I therefore do not subscribe to the position taken in Judge Heaney's original opinion dissenting from the decision reached by the panel. 751 F.2d at 975–77. I do believe, however, for substantially the same reasons given by Judge Heaney as an alternative ground in his present dissent, that the Double Jeopardy Clause bars Flittie's prosecution as an accessory after the fact. I add a few words of explanation.

As the Court says, *ante* at 936, the Double Jeopardy Clause envisages a number of distinct situations in which prosecution or punishment may be barred. Among these are retrial for the same offense after conviction and a federal rule of collateral estoppel. These two situations are distinct one from the other. Even if *Ashe v. Swenson* does not apply, a second prosecution is barred if the second trial is for the same offense of which Flittie was convicted in the first trial. This aspect of the case is discussed in part IA of the Court's opinion, *ante* at 936–937, and the conclusion is reached that conspiracy to murder is not the same offense as accessory after the fact to murder, since each crime requires proof of a fact that the other does not, *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). This line of analysis is based on the statutory elements of the two offenses rather than the evidence at trial, *Illinois v. Vitale,* 447 U.S. 410, 416, 100 S.Ct. 2260, 2265, 65 L.Ed.2d 228 (1980). Therefore, Flittie's "conviction on the conspiracy charge did not prevent a second prosecution on the accessory count," *ante* at 937.

This is true as far as it goes—as the two offenses are not statutorily the same, there is no automatic bar under *Vitale* to *trying* Flittie separately on both charges. However, he still may not be *convicted* on both if the basis of the second is essentially identical to that of the first. Very similiar facts, but a significantly different procedural posture, were presented in *Vitale.* The defendant there, who had pleaded guilty to failing to reduce speed to avoid an accident, challenged the state's subsequent attempt to prosecute him for involuntary manslaughter in connection with the same accident. The Supreme Court held that because a manslaughter conviction *might* be based on evidence other than defendant's speed, the second prosecution could proceed. However, the Court added, if the manslaughter prosecution actually "relies on and proves a failure to slow ... as the reckless act ...," Vitale would have a substantial claim of double jeopardy," 447 U.S. at 421, 100 S.Ct. at 2267, a claim the four-member minority characterized as "dispositive." *Id.* at 426, 100 S.Ct. at 2270. Unlike Vitale, Flittie has already been convicted twice, apparently on the same grounds. It is to deal with precisely this situation that *Vitale* left open the possibility that double jeopardy might exist even when two offenses are statutorily not "the same" if the convictions are based on the same evidence.

Even if *Vitale* had not provided for this situation, an inquiry into the evidence presented in this case should be permitted to determine Flittie's double-jeopardy claim because the conspiracy statute was embellished by indictment and by jury charge to include conduct subsequent to the substantive crime. The usual concept of conspiracy, both at common law and under modern statutes, is that two or more persons make an agreement to commit a crime. Some statutes, *e.g.,* S.D.Codified Laws Ann. § 22–3–8, also require that one or more of the conspirators commit some overt act to effect the object of the conspiracy. Conceptually, the gist of the offense remains focused on conduct occurring before the commission of the substantive crime. Af-

ter that crime has been committed, the agreement to commit it has obviously been carried out, and there can no longer be any act to effect the object of this agreement, the object having already been attained. Normally, therefore, if only the words of the statute are to be looked at, I would agree that the offense of conspiracy is completely separate from the offense of accessory after the fact.

Here, however, both the indictment charging Flittie with conspiracy and the opinion of the Supreme Court of South Dakota affirming his accessory conviction, *State v. Flittie*, 318 N.W.2d 346 (1982), give the statute meaning going beyond the traditional concept of conspiracy. The indictment charges that Flittie and Downs conspired to kill Ruth Flittie "[d]uring the week immediately preceding the 10th day of October, 1975, and thereafter until on or about the 10th day of May, 1976." Mrs. Flittie was killed on October 10, 1975, so a good deal of the time period covered by this alleged conspiracy occurred after the crime of murder had been completed. In addition, as the Supreme Court of South Dakota has stated, "the jury in the first trial convicted defendant on the conspiracy charge based on his post-murder conduct." *Id.* at 349.

It is this same post-murder conduct that is the basis of the conviction on the accessory charge. This means that in the special circumstances of this case, the Supreme Court of South Dakota has interpreted the state's conspiracy statute as embodying the same offense as the accessory statute, or, at the very least, that the accessory charge is a lesser included offense of the conspiracy charge. All of the evidence introduced against Flittie on the accessory charge had already been considered by the jury in the first trial, and it was this very evidence that persuaded the first jury to convict Flittie of conspiracy. Thus, although normally what one does after the completed crime is no part of a conspiracy charge, here the offense of conspiracy, as actually charged in the indictment, included post-murder conduct as one of its elements, thereby making the conspiracy offense fully inclusive of the later accessory charge. See also *State v. Flittie, supra,* 318 N.W.2d at 350–51 (Fosheim, J., dissenting).

A standard aspect of Supreme Court double-jeopardy doctrine holds that a defendant once convicted cannot be thereafter prosecuted for a lesser-included offense. See *Garrett v. United States,* — U.S. ——, 105 S.Ct. 2407, 2416–17, 85 L.Ed.2d 764 (1985). To this rule there seems to be an exception, namely that the second prosecution is permitted if the legislature that defined the offenses in question clearly manifested an intention that both offenses be separately punishable. *Missouri v. Hunter,* 459 U.S. 359, 368, 103 S.Ct. 673, 679, 74 L.Ed.2d 535 (1983). As Judge Heaney says, it is simply inconceivable that the South Dakota legislature intended that Flittie's post-murder conduct be punished as both "conspiracy" and "accessory after the fact," and the opinion of the Supreme Court of South Dakota does not so hold. The point becomes clear, I think, if one considers what would have happened if, in the original indictment, Flittie had been charged as an accessory after the fact, as well as with murder and conspiracy. Suppose the first trial had gone exactly as it actually did; the jury acquitted Flittie of murder but convicted him of conspiracy on the basis of post-murder conduct. The same jury would necessarily have had to convict Flittie as an accessory after the fact, because the same post-murder conduct underlies this charge. Would the trial court then have been authorized to impose separate punishments on Flittie for both conspiracy and being an accessory? The answer, I think, is clearly "no." It must follow that a separate punishment cannot be imposed after a second trial. The reasons for double-jeopardy protection become, if anything, greater when multiple trials are involved.

This case involves the very kind of governmental oppression that the Double Jeopardy Clause was intended to prohibit. The State's decision to prosecute Flittie a second time is obviously based upon its disappointment at the first jury's verdict of ac-

quittal on the murder charge. Not satisfied with the punishment obtained on the conspiracy charge, the State has now prosecuted Flittie for exactly the same conduct, changing only the legal label technically describing the offense. For these reasons, I would hold the second prosecution barred, and I therefore respectfully dissent.