UNITED STATES of America, Appellee,

v.

Mario Antonio
POLANCO-GOMEZ, Appellant.

No. 87-1403.

United States Court of Appeals,
Eighth Circuit.

Submitted Aug. 17, 1987.

Decided March 7, 1988.

Rehearing and Rehearing En Banc
Denied April 26, 1988.

Neal Kirkpatrick, Fort Smith, Ark., for appellant.

Matthew W. Fleming, Asst. U.S. Atty., Fort Smith, Ark., for appellee.

Before HEANEY, WOLLMAN, and MAGILL, Circuit Judges.

WOLLMAN, Circuit Judge.

Mario Antonio Polanco-Gomez appeals from a district court[1] judgment entered on a jury verdict convicting him of illegally reentering the United States after deportation. 8 U.S.C. § 1326. We affirm.

Polanco-Gomez, an illegal immigrant from El Salvador, was arrested by United States Border Patrol agents on April 1, 1985. Subsequently, an Immigration Law Judge (ILJ) in El Paso, Texas, held a group deportation hearing for Polanco-Gomez and fifty-two other persons from six different Spanish-speaking countries. An interpreter translated the entire proceeding into Spanish. After the hearing, Polanco-Gomez was deported to El Salvador. Fourteen months later, United States Border Patrol agents found Polanco-Gomez during a raid of the Northwest Arkansas Poultry Plant in Rogers, Arkansas. Polanco-Gomez was indicted on charges of unauthorized reentry after deportation in violation of 8 U.S.C. § 1326.

Before trial, Polanco-Gomez moved to suppress evidence of his deportation on the ground that he was denied a fundamentally fair deportation hearing because he speaks no English and was unable to understand the proceedings. He also alleged that the entire hearing was not conducted in accordance with due process of law. After reviewing the transcript of the deportation hearing, the district court concluded that the hearing had been conducted with due regard for Polanco-Gomez's constitutional rights and thus denied the motion. The jury returned a guilty verdict, and the district court sentenced Polanco-Gomez to two years' imprisonment and a $1,000 fine. The execution of the sentence was suspended, and Polanco-Gomez was placed on probation for five years with a special condition that he comply with all immigration and naturalization laws.

## I.

On appeal, Polanco-Gomez first argues that the district court erred in denying the motion to suppress evidence of his deportation. Specifically, he argues that the trial court erred by failing to hold an evidentiary hearing, at which he would have testified that, because of his dialect, he was unable to understand the Spanish translation the interpreter rendered. He also would have shown that he was denied due process because the group deportation hearing was confused and chaotic. The government responds that Polanco-Gomez never requested an evidentiary hearing and that the trial court's review of the deportation hearing transcript was sufficient. Furthermore, the government argues that group deportation hearings are constitutionally permissible.

The Supreme Court has recently affirmed this court's authorization of collateral attacks on deportation orders. *United States v. Mendoza-Lopez*, —— U.S. ——, 107 S.Ct. 2148, 2155, 95 L.Ed.2d 772 (1987). Due process requires that "a collateral challenge to the use of a deportation proceeding as an element of a criminal offense must be permitted where the deportation proceeding effectively eliminates the right of the alien to obtain judicial review." *Id.* In *Mendoza-Lopez*, the immigrants were deprived of judicial review because the immigration judge had not adequately informed them of their right to request suspension of deportation and had accepted

---

1. The Honorable H. Franklin Waters, Chief Judge, United States District Court for the Western District of Arkansas.

their unknowing waivers of their right to appeal. *Id.* at 2156. Thus, their deportations could not be used to support a felony conviction for illegal reentry after deportation. *Id.*

▇ In this case, the district court permitted Polanco–Gomez to collaterally attack the underlying deportation. The district court's finding that the deportation hearing was conducted with due regard for Polanco–Gomez's constitutional rights, although lacking a detailed analysis, is amply supported by the record. First, nothing in the record indicates that Polanco–Gomez could not understand the interpreter's Spanish translation. The ILJ asked each respondent if he understood why he was at the hearing. A single, translated, affirmative response appears on the record as one answer for all of the respondents. *Cf. United States v. Barraza–Leon*, 575 F.2d 218, 221 (9th Cir.1978) (concluding that single, translated reply, "indicating the substance, though doubtless not the precise words, of each respondent's answer" in group deportation hearing not violative of due process). Polanco–Gomez never indicated that he could not understand the ILJ's questions. Throughout the proceedings, he responded appropriately to a variety of questions. He admitted the specific allegations against him: that he was not a United States citizen but a citizen of El Salvador; that he had entered the United States near Del Rio, Texas, on March 29, 1985, without being inspected by an immigration officer. Later, Polanco–Gomez acknowledged that he understood the interpreter.

▇ Second, we conclude that the deportation hearing, although involving a large number of respondents, was conducted in accordance with due process. The Supreme Court has expressly reserved the question of the propriety of group deportation procedures. *United States v. Mendoza–Lopez*, 107 S.Ct. at 2150 n. 1. The Ninth Circuit has stated that due process demands that "mass deportation hearings must have an outer limit," and concluded that hearings with twenty-nine detainees reached that limit. *United States v.*

*Calles–Pineda*, 627 F.2d 976, 977 (9th Cir. 1980) (per curiam). In subsequent cases, however, the Ninth Circuit has clarified its view, finding that "reaching the outer limit is not simply a function of how many or how few people are involved, but also whether the number results in prejudice to individuals." *United States v. Nicholas–Armenta*, 763 F.2d 1089, 1091 (9th Cir. 1985). In *Nicholas–Armenta*, the defendant's due process challenge to his thirty-three person deportation hearing failed because he did not demonstrate actual prejudice. *Id.* at 1091. *Cf. United States v. Mendoza–Lopez*, 781 F.2d 111, 113 (8th Cir. 1985) (successful collateral attack predicated on showing prejudice), *aff'd*, — U.S. ——, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987). Thus, a defendant must show prejudice to successfully collaterally attack a deportation hearing on due process grounds.

Here, the ILJ excused eleven of the respondents after they indicated that they wished to be represented by an attorney. Forty-one individuals went forward with the proceedings. Polanco–Gomez does not contend that the proceeding resulted in actual prejudice to him or that he had a defense to his deportation. Although we do not approve of the Immigration and Naturalization Service's practice of holding deportation hearings for ever larger numbers of detainees—a practice that if continued will inevitably lead to a holding such as that proposed by the dissenting opinion—in the absence of any showing by Polanco–Gomez of any actual prejudice, we hold that no due process violation occurred.

In light of the above discussion, Polanco–Gomez's contention that a hearing was required is without merit. Significantly, Polanco–Gomez neither requested a hearing nor submitted an affidavit supporting his contentions. Evidentiary hearings need not be held as a matter of course when a motion to suppress is filed. *United States v. Mims*, 812 F.2d 1068, 1073–74 (8th Cir. 1987) (concluding that a hearing will not be granted unless the moving papers are sufficiently definite, detailed and nonconjectural to show that issues of fact are in question). A hearing is not required if a

dispute can be resolved on the basis of the record. *Reese v. Frey,* 801 F.2d 348, 350 (8th Cir.1986) (denying habeas corpus petition without hearing).

## II.

▨ Polanco–Gomez next argues that the trial court erred by prohibiting him from offering evidence to establish a choice of evils or duress defense. His offer of proof was that he had reentered the United States after deportation because he feared for his life in El Salvador. His mountain village is constantly occupied by either government troops or anti-government rebels. Essentially, Polanco–Gomez was attempting to prove that he qualified for political asylum. *Cf. I.N.S. v. Cardoza–Fonseca,* —— U.S. ——, 107 S.Ct. 1207, 1222, 94 L.Ed.2d 434 (1987) (holding that to show a well-founded fear of persecution to qualify for asylum under the Refugee Act an individual need not prove that it is more likely than not that he will be persecuted in his home country). A criminal trial for the felony of illegal reentry after deportation, however, is not the proper forum to argue a case for political asylum.

▨ The compulsion or duress that will excuse criminal conduct must be such as "to induce a well-founded fear of immediate great bodily harm or death." *United States v. Palmer,* 458 F.2d 663, 665 (9th Cir.1972). If there was a reasonable, legal alternative to violating the law, the defense of necessity will fail. *United States v. Bailey,* 444 U.S. 394, 410, 100 S.Ct. 624, 634–35, 62 L.Ed.2d 575 (1980). Prior to his arrest, Polanco–Gomez had not applied for political asylum, although the ILJ had informed him of his right to do so. Polanco–Gomez's offer of proof failed to show that he would have experienced immediate harm had he stayed in El Salvador. Additionally, he had the option of going to a country other than the United States. Thus, the court did not err in ruling that the defense of duress was not available.

The judgment is affirmed.

HEANEY, Circuit Judge, dissenting.

I respectfully dissent. In my view, the April 30, 1985 mass deportation hearing was fundamentally violative of due process. Thus, it cannot serve as the basis of appellant's criminal conviction in this case.

It is impossible for a fair hearing to be conducted simultaneously for fifty-two people. This record demonstrates that fact convincingly. It appears that a significant portion of the hearing was conducted in English. The appellant, however, did not speak English. Moreover, with very few exceptions, the interpreter did not pose questions to him as an individual. In almost every instance, he was addressed as a member of a group of people who allegedly came from El Salvador. It is unclear whether the appellant or the other members of the group understood what was happening in the proceeding or whether they even individually responded to the queries from the Immigration Judge. Given such facts, the appellant could not have received the procedural protections mandated by the Constitution.

1. All fifty-two individual defendants at the hearing were addressed as a group in English. First, they were advised of their right to counsel. If they were not represented and wanted counsel, they were told to stand. Apparently, some of the fifty-two understood English and stood. They were excused.

The judge continued, assuming his previous remarks to have been understood, "Then the rest of you then all wish to speak for yourself without an attorney or representative present today?" Immigration Hearing Transcript (IHT) at 10. That question was immediately followed in the record by the phrase: "Interpreter: Yes, by each." Apparently, this indicated that each of the defendants had decided to go forward with the proceedings without an attorney. Yet, it is unclear whether each individual understood and responded to the judge's query.

Moreover, based on this exchange, it appears that the interpreter only translated the judge's second statement and that the non-English speaking individuals at the im-

migration hearing were never fully advised of their right to counsel.

2. The judge said in English that each person had received an order to show cause. This order stated the reason each individual could be deported from the United States. The judge said he would inquire whether each member had received a copy of the order and whether their name was correctly spelled in it. The judge then called each person's name, including the appellant's. He went on:

> I'm going to read and explain these allegations to you and ask you to tell me whether the information contained here is true or not true. Allegation number one is * * * you are not a native or citizen—* * * You have no knowing claim to being a citizen of the United States through birth through a parent or parents * * *. Knowing this, do any of you claim to be a citizen of the United States."

IHT at 14.

He then asked the group: "Do you claim to be a citizen of the United States." As before, the interpreter simply stated "No by each." Again, there is no indication in the record that the interpreter repeated the prior statements of the judge. To the contrary, there is only the simple question and simple answer. Moreover, there is nothing in the transcript to indicate the manner in which each person responded—whether by oral answer, a nod of the head, or some other manner.

> The judge continued:
> It also says you're not a national of the United States. A national is a person who owes their permanent loyalty or allegiance or fidelity to the government of the United States. Do any of you owe your permanent loyalty or allegiance to the government of the United States?

IHT at 15.

Again, without any further elaboration, the interpreter responded: "Nobody,"

> The judge then asked the following question:
> To all those remaining whose names have not been called allegation two is

your [sic] natives of El Salvador and citizen of El Salvador that means you were born in the country of El Salvador, your [sic] citizen of that country and have never become a citizen of any other country. Is that allegation true or not true?

IHT at 17.

Again, without more, the interpreter replied: "True by each."

A few moments later, the only individualized question was asked of the appellant. The exchange was as follows:

> JUDGE: To the next three allegations three is the same Mr. Mendez–Gonzales, Mr. Magana–Flores, and Mr. Gomez–Polanco, allegation three that you all entered the United States through Del Rio, Texas, on March 29, 1985. Is that true or not true?
> INTERPRETER: March 29.
> JUDGE: Yes, ma'am.
> INTERPRETER: True by each.

IHT at 19–20.

The judge then asked the group as a whole this question:

> JUDGE: Allegation four to all of you except for Ms. Hernandez–Garcia. You were not then inspected by an Immigration Officer. In other words, when you came into the United States on the day ... you said you came into the United States, ... (unintelligible) ... and Immigration Officer at a port of entry, talked to that officer, answered that officers [sic] questions and let that officer decide whether or not you can come in the United States, came in by the river, the fence, or some other way without talking to an immigration officer. In each of your cases is that true or not true?
> INTERPRETER: True by each.

IHT at 25.

Again, the record fails to indicate the nature of the answer by individuals in the group.

Strangely, only after this question had been asked and presumably answered did the judge tell the group the implications of their answer.

**240**

JUDGE: Then with that the government charges each of you could be deported under Section 241(a)(2) of the Immigration Act, in that you entered the United States without inspection. I'll explain this to you. The Immigration laws of the United States provides that every alien that comes to the United States must go to an Immigration Officer at a port of entry, talk to that officer, answer that officer's questions, identify yourself as an alien, and let that officer decide whether or not you can come into the United States. If you do not do it that way, if you come in by the river, the fence, or falsely claiming to be a United States citizen, the law says you should be deported. In each of your cases, is it true or not you could be deported because of this law.

INTERPRETER: True by each.

IHT at 25.

Through this, and earlier questions and answers, each person in the group theoretically consented to deportation. I cannot, on the basis of this record, believe that they were fully informed of their right to counsel, the nature of the offense that each had allegedly committed, or, most importantly, that each one understood the questions asked, or that each individually answered the questions asked. Under such circumstances, the denial of due process is apparent.

After the questions outlined above were asked and answered, the judge explained in English to the individuals present their right to political asylum. The judge explained this right existed if there was a well-founded fear of persecution because of political opinion. He then asked whether anyone would like to ask for political asylum. IHT at 27. The interpreter answered, "No, by each." Again, the record does not indicate whether the interpreter explained the right or simply asked the second question. This Court should not assume the former.

It is difficult to imagine a hearing more lacking in due process. I would hold that mass hearings are not violative of due process only if they are restricted to a reason-able number of people (certainly less than fifty-two) and only if the record makes it clear that the interpreter repeats in full the statements and questions of the judge and secures an affirmative oral response from each person whom the government seeks to deport. Unfortunately, that was not the procedure followed here. I would thus reverse the district court.