**UNITED STATES of America, Appellee,**

v.

**Julio Cesar SANTOS–VANEGAS, Appellant.**

**No. 88–2181.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 12, 1989.

Decided June 26, 1989.

R. Thomas Day, St. Louis, Mo., for appellant.

John T. Bannon, Jr., Washington, D.C., for appellee.

Before LAY, Chief Judge, and ARNOLD and BOWMAN, Circuit Judges.

ARNOLD, Circuit Judge.

Julio Cesar Santos–Vanegas, an immigrant who was deported to his native El Salvador on April 13, 1986, was arrested on March 15, 1988 for the felony of unlawful re-entry into the United States after deportation in violation of 8 U.S.C. § 1326. Santos–Vanegas moved to suppress evidence of the prior deportation on grounds that the Immigration Law Judge (ILJ) who entered the deportation order had not advised him of his right to appeal to a federal court, and that the ILJ had applied an incorrect legal standard with regard to his political-asylum application, according to *INS v. Cardoza–Fonseca*, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). The District Court adopted the recommendation of a United States Magistrate to deny the defendant's motion to suppress, and convicted Santos–Vanegas under § 1326 on July 21, 1988.

The defendant argues on appeal that the deportation order underlying his conviction was illegal and can be collaterally attacked. In light of the Supreme Court's ruling in *United States v. Mendoza–Lopez*, 481 U.S. 828, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987), we agree that the prior deportation proceedings, as used to establish an element of a criminal offense, are reviewable and that they deprived the defendant of liberty without due process. Accordingly, we reverse the § 1326 conviction based on the deportation.

## I.

Julio Cesar Santos–Vanegas was born in 1950 in El Salvador. He fled his country in 1984 because he was frightened by Communist guerrillas who "put guns before me and told me that they would kill me if I didn't go with them." TR 10 (Jan. 22, 1986). He also testified that there were many guerrillas in his home town, *id.* at 12, who go after civilians and may kill them for refusing to join. *Id.* at 9. Santos–Vanegas and his family supported the Salvadoran government against the guerrillas, and he belonged to the National Conciliation Party and the Republican Party. *Id.* at 10, and Asylum Request, Ex. B, at 3.

Apparently, all but one of his several siblings had left El Salvador by 1984, with some staying in refugee camps in Honduras and one living in Texas. TR 13–14 (Jan. 22, 1986).

The defendant fled through Guatemala and Mexico, entering the United States without inspection near Hidalgo, Texas on or about February 28, 1984. He applied for political asylum at an Immigration and Naturalization Service (INS) office in Houston three months later, on May 22, 1984. The following day, the INS took him into custody, issuing an order to show cause why he should not be deported under 8 U.S.C. § 1251(a)(2) for entry without inspection. The defendant did not appear at his scheduled deportation hearing in Houston on April 29, 1985, and then on August 21st he was arrested by INS officers in Florida.

Santos–Vanegas appeared before an ILJ in Miami on October 3, 1985. The ILJ adjourned this first hearing and two subsequent ones to allow the defendant time to contact a Texas lawyer with whom Santos–Vanegas had had some earlier communication.[1] The ILJ advised the defendant that

> if your lawyer in Houston is not able to come, you have a right to hire you a local lawyer here without cost to the United States Government. And I'm also going to.... [g]ive you a list of organizations in [the Miami] area that have free lawyers. You might be able to get a free lawyer to help you if you need a free lawyer.

TR 4–5 (Oct. 15, 1985). The defendant testified that he tried to contact his Texas lawyer, TR 3–4 (June 2, 1988), and also that his nephew in Florida had promised to hire an attorney on his behalf. *Id.* at 15–16. The defendant did not pursue assistance from any of the Miami legal-aid organizations, although he testified that he had been tempted to ask for help in doing so from Spanish-speaking INS employees. *Id.* at 17.

On January 22, 1986, the ILJ resumed the deportation proceedings and heard the defendant's political-asylum claim *pro se.* The Judge stated that he was reviewing the defendant's asylum application as if it were an application for withholding of deportation. Oral Decision at 1 (Jan. 22, 1986). The ILJ acknowledged that Santos–Vanegas had "some subjective fear of harm if returned to El Salvador," based on what the guerrillas might do to him if he again refused to join their cause. *Id.* at 2. However, the ILJ concluded that the defendant's fear "is unsupported by any objective evidence in this matter." *Id.* Because the guerrillas had not carried out the threats made on the defendant's life in this instance, the Judge stated: "[s]o nobody really was getting ready to kill you, right? They just frightened you and you got scared and left." TR 10 (Jan. 22, 1986). The Judge also concluded that a principal reason for the defendant's flight from El Salvador was his inability to find work there. The ILJ drew support for his determination that Santos–Vanegas was motivated by economic concerns from the defendant's testimony that, in his journey from El Salvador, he had left Guatemala after four days because he was not finding work in that country, and that he did not try to get a job during his three days in Mexico en route to the United States. At the conclusion of the January 22nd hearing, the ILJ entered a deportation order and denied defendant's application for political asylum. He informed the defendant of his right to appeal the decision to the Board of Immigration Appeals (BIA).

Santos–Vanegas did file an administrative appeal on January 29, 1986, with the assistance of an INS employee who filled out the notice-of-appeal form. Santos–Vanegas had no formal education and no training in the American legal system. Findings of Fact, Magistrate's Order and Recommendation, ¶ 11 (June 3, 1988). He spoke no English and could not read or write in any language. *Id.* Unable even to

---

1. The INS apparently sent notices of scheduled hearings to a Texas lawyer whose name appeared on Santos–Vanegas's file, although Santos-Vanegas testified this was not the name of the attorney who had helped him before in Texas. TR 1 (Oct. 3, 1985); TR 3 (Oct. 15, 1985); TR 6 (Dec. 18, 1985); TR 7 (Jan. 22, 1986); TR 6–7 (June 2, 1988).

write his own name, his appeal bears a "+" to mark his signature. *Id.* The reasons stated on his notice of appeal for contesting the January 22nd decision reveal the defendant's confusion about the deportation order issued by the ILJ and its consequences:

.... Because of my well-founded fear, the Immigration Judge gave me an opportunity to submit an application for [political asylum] in the U.S. which I failed to submit within the given date because they were lost and I did not know they could be replaced prior [to] my court date. Please allow me to do so.

Notice of BIA Appeal, Ex. C. We have no reason to think that the timeliness of the defendant's asylum application was ever at issue in his case. Moreover, the ILJ obviously did *not* recognize Santos–Vanegas's well-founded fear.

The BIA dismissed the defendant's appeal on the merits on April 3, 1986. The opinion reasserts the ILJ's view that an asylum application could be treated as an application for withholding of deportation: "(T)he eligibility standards for withholding of deportation and asylum are not meaningfully different and, in practical application, converge." BIA No. A26–419–463–Miami (April 3, 1986).

On April 9, 1986, the INS issued a Warrant of Deportation for Santos–Vanegas, and he was deported on April 13th, ten days after the denial of his BIA appeal. The notice that the defendant received on April 9th about his imminent deportation did not in any way indicate that he could pursue further appeal in the federal courts. Ex. 3. Neither had the ILJ or anyone else earlier advised him of any opportunity to appeal beyond the administrative level. Santos–Vanegas testified that he knew to file a BIA appeal because of the assistance he received from the INS employee, and that no one informed him that he could then challenge the BIA's decision in the court system. TR 4–5 (June 2, 1988).

After his deportation, the defendant was found in Florissant, Missouri on March 15, 1988. He had not obtained the express consent of the Attorney General to reapply for admission to this country, and thus was arrested pursuant to 8 U.S.C. § 1326(a) for unlawful re-entry into the United States. The defendant moved to suppress the 1986 deportation order underlying the charged criminal offense. A United States Magistrate conducted a hearing and then recommended denial of the motion to suppress evidence. The Magistrate attempted to distinguish this case from *United States v. Mendoza–Lopez*, 481 U.S. 828, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987), asserting that the defendant here "was able to pursue judicial review if he had known and chosen to do so." Magistrate's Order and Recommendation, at 9 (June 3, 1988). The District Court adopted the Magistrate's Report on July 7, 1988. Since the only contested issue was whether the 1986 deportation order could be relied on by the government to prove the criminal offense, the Court proceeded to find Santos–Vanegas guilty as charged, and sentenced him to time already served with a recommendation that he not be deported. TR 5–7, 9–12 (July 21, 1988). We now consider the defendant's challenge to the use of the underlying deportation order as proof of the criminal offense.

## II.

A defendant must be permitted to attack collaterally "the use of a deportation proceeding as an element of a criminal offense ... where the deportation proceeding effectively eliminates the right of the alien to obtain judicial review...." *Mendoza–Lopez, supra,* 481 U.S. at 839, 107 S.Ct. at 2155. The defects identified by the Supreme Court in Mendoza–Lopez's administrative hearing—the failure of the ILJ to explain adequately the aliens' rights to appeal their deportation orders and to seek statutory relief known as suspension of deportation—"amounted to a complete deprivation of judicial review.... Because the waivers of [the aliens'] rights to appeal were not considered or intelligent," the government could not rely on the deportation orders to prove that they had violated § 1326. *Id.* at 840, 107 S.Ct. at 2156. The Supreme Court quoted the District Court's

finding that it is " 'inconceivable that they would so lightly waive their rights to appeal ... if they had been fully apprised of the ramifications of such a choice.' " *Id.* at 832, 107 S.Ct. at 2151.

■ For Santos–Vanegas, too, the government cannot use the earlier deportation as a basis for a § 1326 conviction. He was never apprised, by the ILJ during his hearings or in the notice of his impending deportation that he received from the BIA, of his right to appeal the administrative decision in federal court. As already noted, his confusion about the consequences of the ILJ's decision was manifested in his BIA appeal, and he had only a very short time from when the BIA dismissed that appeal until he was deported in which to ascertain his remaining appeal option and file a judicial challenge. It is true, as the government argues, that Santos–Vanegas waived his right to counsel. Had he made use of that right, by either retaining private counsel or getting legal-aid assistance, his counsel might have filed a timely appeal in federal court. Nevertheless, *Mendoza–Lopez*, a case where the aliens also waived their right to counsel, establishes an affirmative obligation on the government to advise an alien effectively of his or her right to judicial review of deportation proceedings if the government wants to use the deportation later to prove a criminal offense. The government ought to have told the defendant of his opportunity to pursue further challenge in federal court.

### III.

■ We have previously ruled that successful collateral attack on a deportation order requires a showing of actual prejudice. *United States v. Mendoza–Lopez*, 781 F.2d 111, 113 (8th Cir.1985), *aff'd*, 481 U.S. 828, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987); *United States v. Polanco–Gomez*, 841 F.2d 235, 237 (8th Cir.1988). Santos–Vanegas satisfies that requirement because the two defects in his deportation proceedings—the failure to apprise him of the opportunity for judicial appeal and the application of an incorrect legal standard—may well have resulted in a deportation that would not otherwise have occurred. Had Santos–Vanegas filed an appeal in a federal court after the BIA dismissed his case on April 3, 1986, challenging the ILJ's use of an improper legal standard to review his political-asylum claim, the defendant's case would in all likelihood have been stayed pending decision in *INS v. Cardoza–Fonseca*, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), in which the Supreme Court had granted certiorari on February 24, 1986. *Cardoza–Fonseca* raised the question of the appropriate standard of review for political-asylum applications.

The Supreme Court held in *Cardoza–Fonseca* that the standard which governs political-asylum claims is less stringent and more favorable to aliens that that which governs withholding-of-deportation claims. Asylum may be granted if an applicant shows "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). To be entitled to withholding of deportation, "an alien must demonstrate that 'it is more likely than not that the alien would be subject to persecution' in the country to which he would be returned." *Cardoza–Fonseca, supra,* 480 U.S. at 423, 107 S.Ct. at 1209 (quoting *INS v. Stevic,* 467 U.S. 407, 429–30, 104 S.Ct. 2489, 2501, 81 L.Ed.2d 321 (1984)). This "more likely than not" standard, and also the "clear probability" standard that has been upheld for withholding-of-deportation cases (see *Stevic, supra,* 467 U.S. at 430, 104 S.Ct. at 2501), derive from objective language in 8 U.S.C. § 1253(h): the Attorney General shall withhold deportation upon determining that an "alien's life or freedom *would* be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion" (emphasis added). The Supreme Court distinguished the standard governing asylum claims, with its reference to "fear," from the standard for withholding of deportation, with its objective language.

That the fear must be "well-founded" does not alter the obvious focus on the

individual's subjective beliefs, nor does it transform the standard into a "more likely than not" one. One can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place.... [For example, a man could certainly have a well-founded fear if] "it is known that in the applicant's country of origin every tenth adult male person is either put to death or sent to some remote labor camp."

*Cardoza–Fonseca, supra,* 480 U.S. at 431, 107 S.Ct. at 1213 (quoting 1 A. Grahl–Madsen, The Status of Refugees in International Law 180 (1966)).

At any rate, the law is clear after *Cardoza–Fonseca* that reviewing a political-asylum claim under the standard for withholding of deportation, as the ILJ and the BIA did in this case,[2] is improper. The INS recognized in an internal memorandum that political-asylum requests were to receive different, and more lenient, treatment following *Cardoza–Fonseca.* Memorandum from Associate Commissioner Richard E. Norton, App. H (March 24, 1987).

Had the asylum claim of Santos–Vanegas been evaluated using the correct, less exacting legal standard, it seems quite possible that he could have succeeded in showing a well-founded fear of persecution. The government did not dispute his testimony regarding the confrontation with the guerrillas, nor did the ILJ make any credibility findings indicating that he disbelieved the defendant's testimony. In fact, the ILJ acknowledged Santos–Vanegas's "subjective fear," but he decided that that fear was "unsupported by any objective evidence." However, the objective component of the political-asylum standard does not demand corroborating evidence to support an applicant's testimony; it simply means that the alien's perception of his or her risk must be "well-founded" in the sense of being reasonable. If a group of guerrillas with a reputation for killing those who refuse to join their cause corner a man who is politically loyal to the existing regime, put guns to his head and threaten to shoot him if he does not accompany them, the man might reasonably fear for his life in a subsequent encounter. The fact that the guerrillas did not carry out their threat this time does not make the victim's perception of danger in the future unreasonable. Furthermore, even if the defendant's economic circumstances were a contributory factor in his decision to live in the United States, those circumstances need not cancel out what the ILJ or the BIA could have recognized as a valid fear of persecution, applying the correct legal standard.

We hold that Santos–Vanegas has satisfied the prejudice requirement by showing that he might not have been deported under the proper standard of review for his asylum request. Since he was not apprised of his right to take an appeal in federal court, and since his unknowing waiver of that right resulted in prejudice, the prior deportation may not serve to establish the criminal offense with which he has been charged. Accordingly, the defendant's conviction is reversed.

It is so ordered.

---

**2.** See Findings of Fact and Conclusions of Law, Magistrate's Order and Recommendation at 5, 11 (June 3, 1988).