UNITED STATES of America, Plaintiff,

v.

Agustin ARANGO–CHAIREZ, Defendant.

No. 4:CR94–3016.

United States District Court,
D. Nebraska.

Oct. 12, 1994.

Vollis E. Summerlin, Jr., Harding & Ogborn Law Firm, Lincoln, NE, for defendant.

Alan L. Everett, U.S. Atty., Lincoln, NE, for the U.S.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This matter is before the court on the Magistrate Judge's Report and Recommendation (filing 23) and the objections to such Report and Recommendation (filing 24) filed as allowed by 28 U.S.C. § 636(b)(1)(C) and NELR 72.4.

I have conducted, pursuant to 28 U.S.C. § 636(b)(1) and NELR 72.4, a de novo review of the portions of the Report and Recommendation to which objections have been made. I find that the Report and Recommendation (filing 23) should be adopted, and that defendant's objections to the Report and Recommendation (filing 24), should be denied.

IT IS ORDERED:

1. the Magistrate Judge's Report and Recommendation (filing 23) is adopted;

2. the objections of the defendant (filing 24) are denied; and

3. defendant's motion to suppress (filing 15) is granted in part and denied in part, to wit:

a. the motion is granted as to the so-called *Miranda* claims;

b. the motion is denied with respect to the collateral challenge to the 1987 deportation hearing.

## REPORT AND RECOMMENDATION

PIESTER, United States Magistrate Judge.

Pending before the court is defendant's motion to suppress. (Filing 15). For reasons discussed more fully below, I shall recommend that defendant's motion be granted with respect to his *Miranda* claims, and denied with respect to his collateral challenge of his 1987 deportation hearing.

## BACKGROUND

On April 21, 1994, an indictment was filed against defendant for knowingly and unlawfully entering the United States without the prior consent of United States Attorney General where defendant had previously been convicted of transporting or distributing heroin (an aggravated felony) and was subsequently deported, in violation of 8 U.S.C. § 1326(b)(2). (Filing 1.)[1] Defendant pleaded not guilty, and trial was set for July 11, 1994. (Filing 11.) On July 11, 1994 defendant filed a motion requesting that the court suppress the following evidence from trial:

(1) statements made by defendant April 15, 1994 to an Immigration and Naturalization Service ("INS") agent allegedly in violation of his *Miranda*[2] rights;

(2) evidence relating to defendant's 1987 deportation hearing, for the reason that the hearing was unlawful because INS failed to inform defendant of his right to contact the Mexican Consulate;

(3) evidence of prior bad acts and convictions of the defendant, for the reason that such evidence is irrelevant and unduly prejudicial; and

(4) evidence of any alleged aliases of defendant, for the reason that references to such aliases are irrelevant and/or unduly prejudicial.

(*See* filing 15; Brief in Support of Defendant's Motion to Suppress Evidence (Defendant's Brief)).

On August 9, 1994 the court held a hearing on the suppression motion. At the hearing defendant testified that on April 14, 1994, while he was incarcerated at the Lancaster County Correctional Center ("LCCC") on a failure to appear charge, he received a phone call from INS Special Agent Henry Anton. Anton testified that he identified himself as an immigration officer and asked defendant what his name was. Defendant replied "Ray Begay." Anton then asked "what about Augustin Argano–Chairez?" Defendant replied that he was. Anton also asked whether defendant was a citizen of Mexico. Defendant responded "yes." Both defendant and Anton testified that no *Miranda* warning was given at any time during this phone conversation. Anton estimated that the conversation lasted about five minutes.

---

**1.** 8 U.S.C. § 1326 provides:

(a) Subject to subsection (b) of this section, any alien who—
  (1) has been arrested and deported or excluded and deported, and thereafter
  (2) enters, attempts to enter, or is at any time found in, the United States, unless
    (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or
    (B) with respect to an alien previously excluded and deported, unless such alien shall establish that he was not required to obtain such advance consent shall be fined under Title 18, or imprisoned not more than 2 years, or both.

(b) Notwithstanding subsection (a) of this section, in the case of any alien described in such subsection—
  (1) whose deportation was subsequent to a conviction for commission of a felony (other than an aggravated felony), such alien shall be fined under Title 18, imprisoned not more than 5 years, or both; or
  (2) whose deportation was subsequent to a conviction for commission of an aggravated felony, such alien shall be fined under such Title, imprisoned not more than 15 years, or both.

**2.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The next day Anton visited defendant at LCCC. Anton testified that the purpose of this visit was to gather routine biographical information about defendant to complete one section of the standard INS form "I–213," a "record of deportable alien." (*See* Exh. 1.) Defendant and Anton met in an interrogation room at LCCC, which Anton described as twelve foot square with a four foot square table and two chairs inside. Defendant testified that the door to the room was closed; Anton testified that it was open. Both defendant and Anton testified that during the interview no one else was in the room, that defendant was not restrained in any way, and that Anton displayed no weapons.

Anton testified that he initiated the interview by stating that he was an immigration officer, that defendant was an alien and that Anton needed to talk to him; Anton could not recall defendant's response. Anton testified that he suspected defendant was an alien going into the interview based upon his review of defendant's immigration file and a "tip off" by the Lincoln Police Department. Anton testified that the interview lasted about fifteen minutes; defendant testified that it lasted from twenty to thirty minutes. During the interview Anton questioned defendant about citizenship, how he came into the United States and when he did so, and defendant's parents in Mexico. Anton did not recall whether he asked defendant about any aliases, but testified that he did not ask defendant about any prior felonies.

Defendant testified that during the interview he asked Anton if he "could get a lawyer first" but that Anton replied "I'm an immigration officer." Anton testified that defendant never asked for an attorney, never asked to leave, and never asked Anton to leave. Defendant further testified that Anton told him that he (defendant) had to talk to Anton. Anton did not dispute this testimony, and testified that he had not told defendant that defendant *didn't* have to talk to him during either the phone conversation or the LCCC interview. Anton also testified that he neither threatened defendant nor

promised him anything for answering the questions, and that it appeared that defendant had no difficulty understanding Anton and that defendant had given his answers freely, voluntarily and knowingly. Both defendant and Anton testified that Anton did not give defendant a *Miranda* warning at any time during the interview. Anton did not advise defendant of any right to silence, an attorney, that defendant could leave, or that defendant could terminate the interview at any time. Defendant did testify, however, that he felt he could have terminated the conversation at any time (but that he could not, obviously, leave the jail). After the interview Anton took defendant's photograph and fingerprints.

At the hearing defendant also testified about a 1987 deportation hearing. Defendant testified that at the hearing he was one of about thirty-five to forty deportation candidates ("detainees") and that the extent of this "hearing" was his signing a piece of paper and then being placed on a bus bound for Mexico. Defendant testified that there was no one at this hearing he could identify as a lawyer on his behalf or a judge, only immigration officers. Defendant further testified that no one at the hearing told him that he could contact an attorney if he wished, or that he could contact the Mexican Consulate. Defendant testified that he would have called the consulate for help if he had been so advised. When asked on cross-examination how he thought the consulate would have been able to help him, defendant was unsure, but testified about his having lived in the United States for over twenty years. On redirect defendant testified that he was unsure how the consulate would have been able to help him because he was never advised of the right to contact the consulate and find out what assistance the consulate could have provided.

■ The government called as a witness Ernesto Azhocar, the "accredited representative" assigned to represent defendant at this 1987 deportation hearing.[3] As an accredited

---

3. During the hearing defendant objected to Azhocar's testimony, arguing that it was privileged information under the attorney-client privilege, citing in support *U.S. v. Keplinger,* 776 F.2d 678 (7th Cir.1985), *cert. denied,* 476 U.S. 1183, 106 S.Ct. 2919, 91 L.Ed.2d 548 (1986). Defendant

representative it was Azhocar's duty to serve as defendant's (and other detainees') attorney-in-fact, reviewing each detainee's file, determining whether there were any bases for challenging deportation, and ensuring that each detainee understood his or her rights during the deportation proceedings. Azhocar testified that he did not specifically remember defendant or the 1987 hearing in question, but that it was his personal policy and duty (ensured by the oversight of "hardnosed" immigration judges) to assure that the rights of each of the detainees he represented were protected by advising them of their right to have an attorney and contact the Mexican Consulate. Azhocar testified that his practice was to advise his detainees of these rights in both English and Spanish, but conceded that not all detainees paid attention during this advice and some of them sometimes distracted others from hearing as well. Azhocar further testified that he kept no personal record of advising each detainee of his/her right to an attorney and to contact the Mexican consulate. Azhocar also testified that Judge Robert J. Barrett, the immigration judge presiding over defendant's 1987 deportation hearing, was "particularly" careful in advising detainees of their rights. Azhocar explained that judges such as Barrett would ask Azhocar what he had advised the detainees, Azhocar would explain, and then the judge would ask each detainee if this was true. Azhocar conceded that the transcript of the 1987 deportation hearing submitted by the government (exhibit 5) did not reflect any advisement of defendant's rights, but that this transcript was incomplete, reflecting only a few minutes of the entire hearing process, which would last one to two hours.

## DISCUSSION

### Miranda evidence

Defendant argues that the evidence gathered by INS Special Agent Anton as a result of his April 14, 1994 phone conversation and April 15, 1994 personal interview with defendant should be suppressed because Anton failed to give defendant a proper *Miranda* warning before each conversation. The gov-

argued that Azhocar, although not actually an attorney, functioned as defendant's attorney-in-fact, and could not, therefore, testify to statements made by defendant to him. I overruled the objection on the basis of defendant's testimony that he subjectively believed that he was not represented by an attorney at the 1987 hearing. However, I conditioned that ruling on my review of *Keplinger* and other relevant law on the issue. I have undertaken such a review, and have concluded that my ruling was correct.

I note initially that Azhocar testified that he did not remember defendant or the particular 1987 hearing, much less the substance of anything defendant told him during that hearing or any advice he gave in response. Nor did defendant testify that he remembered Azhocar, much less the substance of anything Azhocar advised him during that hearing. Accordingly, I fail to see what testimony of Azhocar might be protected by the privilege in the first place, since the privilege generally covers only confidential communications made by a client to his/her legal representative (and the advice the representative gives in response) concerning the legal matter for which the representative's services were sought.

In any case, even assuming, *arguendo*, that Azhocar's testimony was within the scope of privilege, the testimony is not protected. *Keplinger* concluded, *inter alia*, that the *Keplinger* defendants' various assertions that they subjectively believed certain attorneys represented them individually was insufficient to create the privilege:

> we do not believe [that the proposition stated in *Westinghouse Electric Corporation v. Kerr–McGee Corporation*, 580 F.2d 1311, 1319 (7th Cir.), *cert. denied*, 439 U.S. 955 [99 S.Ct. 353, 58 L.Ed.2d 346] (1978) that the scope of the attorney-client relationship " 'hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice' "] can be deemed equivalent to defendants' implicit argument that an individual's mere subjective belief that he is represented individually will always be sufficient to demonstrate that such a relationship existed for the purpose of the attorney-client privilege.

*Id.* at 701. The present case is even one step removed from *Keplinger:* defendant testified that he *did not* believe that he was represented by an attorney at the 1987 deportation hearing. Defendant cannot suggest that the attorney-client privilege can arise where the purported "client" is not even subjectively aware of the existence of a legal professional. The rationale behind the privilege—that clients feel free to discuss with their attorney all the details of their cases without fear of those details being subject to later disclosure—is obviously nonexistent where an individual is not even aware that a legal professional is present. Ernesto Azhocar's testimony is not protected by the attorney-client privilege and is properly before the court for consideration.

ernment argues that neither of the conversations between Anton and defendant should be considered custodial, requiring a *Miranda* warning.

■ The purpose of the *Miranda* warning, which warns a suspect that she has a right to remain silent, that any statement she does make may be used as evidence against her, and that she has the right to the presence of an attorney, either retained or appointed, is to prevent the government from using the coercive nature of confinement to extract information that would not be given in an unrestrained environment. *See Arizona v. Mauro,* 481 U.S. 520, 529–30, 107 S.Ct. 1931, 1936–37, 95 L.Ed.2d 458 (1987). The need to give a *Miranda* warning arises when: (1) the defendant is in custody; and (2) is interrogated. *See United States v. Griffin,* 922 F.2d 1343, 1347 (8th Cir.1990). While the two elements involve separate inquiries, they are also interrelated, in that they are properly conceptualized on a continuum with "custody" reflecting an initial level of government restraint and "interrogation" "reflect[ing] a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis,* 446 U.S. 291, 300, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980).

■ Thus, the first issue is whether defendant was in custody during the two conversations with Anton. A suspect is considered "in custody" for *Miranda* purposes either when he has been formally arrested and not free to leave the location, or when a reasonable person in the suspect's position would have considered his freedom of movement restrained to a degree that is usually associated with a formal arrest. *U.S. v. Caldwell,* 954 F.2d 496, 499 (8th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 65, 121 L.Ed.2d 32 (1992) (citing *Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984)); *United States v. Goudreau,* 854 F.2d 1097, 1098 (8th Cir. 1988). *Miranda* may be applicable to one in custody for an offense unrelated to the interrogation. *See Mathis v. United States,* 391 U.S. 1, 4–5, 88 S.Ct. 1503, 1504–05, 20 L.Ed.2d 381 (1968). However, incarceration does not *ipso facto* render an interrogation custodial. *See Flittie v. Solem,* 775 F.2d 933,

944 (8th Cir.1985) (en banc), *cert. denied,* 475 U.S. 1025, 106 S.Ct. 1223, 89 L.Ed.2d 333 (1986), *opinion superseded by Flittie v. Solem,* 867 F.2d 1053 (8th Cir.1988); *see also Jenner v. Smith,* 982 F.2d 329, 335 (8th Cir.) ("[w]arnings are not required simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect") (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977)), *cert. denied,* —— U.S. ——, 114 S.Ct. 81, 126 L.Ed.2d 49 (1993).

While the custody issue necessarily focuses upon the totality of the circumstances, *Jenner,* 982 F.2d at 335, the Eighth Circuit has set forth six "common indicia of custody" to provide further guidance in the custody determination:

(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest;

(2) whether the suspect possessed unrestrained freedom of movement during questioning;

(3) whether the suspect initiated contact with authorities or voluntarily acquiesced to an official request to respond to questions;

(4) whether strong arm tactics or deceptive stratagems were employed during questioning;

(5) whether the atmosphere of the questioning was police dominated; and

(6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin,* 922 F.2d 1343, 1349 (8th Cir.1990). No one factor qualifies as dispositive in any given case. Rather, the presence of the first three factors tends to mitigate the existence of custody whereas the presence of the last three aggravate its existence. *Id.* However, I may make a finding of custody even without the affirmative presence of each factor, and "a particularly strong showing with respect to one factor may compensate for a deficiency with respect

to other factors." *Id.* Importantly, the court stressed that this list was non-exhaustive, and was "merely intended to be representative of those indicia of custody most frequently cited by this and other courts when undergoing the prescribed totality of the circumstances analysis." *Id.*[4]

■ With respect to both the phone conversation and the personal interview, I conclude that defendant was in custody. Looking first at the April 14, 1994 telephone conversation, the fourth and sixth *Griffin* factors argue against a finding of custody: no strong arm tactics or deceptive stratagems were employed during the questioning, and defendant was not placed under arrest at the termination of the questioning. However, the first and third *Griffin* factors argue in favor of a finding of custody. Defendant was not informed at the time of the call that Anton's questioning was voluntary, that defendant was free to terminate the call or request Anton to do so, or that defendant was not considered under arrest. It is also clear that defendant did not initiate contact with Anton and did not voluntarily acquiesce to respond. The second and fifth *Griffin* factors—whether defendant possessed unrestrained freedom of movement and whether the environment itself was police-dominated—are closer calls, but in the final analysis favor a finding of custody. Defendant did not testify that he was physically restrained during the phone call to any degree beyond that of the prison environment itself. However, Anton *initiated* the call by identifying himself as an INS agent and then immediately asking defendant what his name was. Under the circumstances, Anton's identity, defendant's alien status, and Anton's failure to make any effort to explain that defendant need not answer his questions contributed to a police-dominated environment where defendant revealed information he may not have revealed in an unrestrained environment. *Arizona v. Mauro, supra.*

■ With respect to the personal interview, the fourth and sixth *Griffin* factors again argue against a finding of custody: no strong arm tactics or deceptive stratagems were employed during the questioning, and defendant was not placed under arrest at the termination of the questioning. The second *Griffin* factor also argues against a finding of custody, in light of defendant's testimony that he felt he could have terminated the interview at any time (but that he could not obviously leave the jail). However, the first and third *Griffin* factors argue in favor of a finding of custody. Defendant was not informed at the time of the phone call that Anton's questioning was voluntary, that defendant was free to leave or request Anton to do so, or that defendant was not considered under arrest. It is also clear that defendant did not initiate contact with Anton and did not voluntarily acquiesce to respond. The fifth *Griffin* factor—whether the environment itself was police-dominated—is again a closer call. Defendant testified that he was not physically restrained during the interview, no direct coercion was applied, no weapons were displayed and that he felt he could have terminated the interview at any time. However, Anton initiated the interview by stating that he was an immigration officer, that defendant was an alien, and that defendant had to answer Anton's questions. Additionally, in response to defendant's request for an attorney, Anton ignored the request and responded "I'm an immigration officer."[5] Bearing in mind the preexisting

---

4. I recognize that this case, as in *Flittie,* is atypical in the sense that defendant was already incarcerated when he was questioned by Anton. As discussed in *Flittie:*

   The Supreme Court recognized in *Miranda* the compelling pressures upon incarcerated persons. 384 U.S. at 467, 86 S.Ct. at 1624. Flittie was in custody, but on an unrelated matter. Incarceration does not *ipso facto* make a statement involuntary. *See Cervantes v. Walker,* 589 F.2d 424, 427 (9th Cir.1978). While Flittie may have been constrained within the penitentiary walls, he was not forced to remain in the

   visitors' room with Harris. Thus, the imprisonment did not produce a coerced statement. *Flittie,* 775 F.2d at 944; *see also Leviston v. Black,* 843 F.2d 302, 304 (8th Cir.), *cert. denied,* 488 U.S. 865, 109 S.Ct. 168, 102 L.Ed.2d 138 (1988). Thus, I apply the *Griffin* factors bearing in mind the preexisting custodial environment imposed by imprisonment itself.

5. Anton disputed defendant's testimony concerning the request for counsel. However, it was within Anton's power to record or otherwise memorialize the interview and he failed to do so. I found the defendant's testimony credible, and

custodial environment of imprisonment itself, I conclude that the overall environment of the interview was police-dominated, causing defendant to feel compelled to reveal information he would not have revealed in an unrestrained environment. *Arizona v. Mauro, supra.*

■ Having found that defendant was "in custody" for purposes of *Miranda* during both the phone conversation and the personal interview, I next address whether those two interactions with Anton are properly characterized as "interrogations" such that a *Miranda* warning was required. Under *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), interrogation occurs as a result of either the government's (1) express questioning; or (2) its functional equivalent, i.e., words or actions "that the police should know are reasonably likely to elicit an incriminating response...." *Id.* at 300–01, 100 S.Ct. at 1689. The "functional equivalent" conceptualization of interrogation

> focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.

*Id.* at 301–02, 100 S.Ct. at 1689–90 (footnote omitted).

Anton's questioning, whether considered by him to be routine or otherwise, was direct and express, and was premised on Anton's statement that he was an INS agent, that defendant was an alien, and that Anton need-

ed to talk to defendant. Moreover, Anton's questions, in light of his suspicions that defendant was an alien and likely a felon, were such that Anton "should have known [they were] reasonably likely to elicit an incriminating response." *Id.* at 300–01, 100 S.Ct. at 1689. Accordingly, both interactions between defendant and Anton were "interrogations" while defendant was "in custody" such that *Miranda* warnings were required. In light of the testimony that no such warnings were given, I shall recommend that defendant's suppression motion be granted with respect to any evidence gained during both the April 14, 1994 phone conversation and the April 15, 1994 personal interview.

## Collateral Attack of 1987 Deportation Hearing

■ Defendant attacks on due process grounds his 1987 deportation hearing, arguing that he was not informed of his right to contact the Mexican Consulate under 8 C.F.R. § 242.2(e). Due process requires that defendant be allowed to collaterally attack the use of a deportation proceeding as an element of a criminal offense where that proceeding "effectively eliminates [his] right to obtain judicial review." *United States v. Santos–Vanegas,* 878 F.2d 247, 250 (8th Cir. 1989) (quoting *United States v. Mendoza–Lopez,* 481 U.S. 828, 839, 107 S.Ct. 2148, 2156, 95 L.Ed.2d. 772 (1987)). To successfully challenge his 1987 deportation hearing, defendant must show that the alleged failure to notify him of his right to contact the consulate: (1) was a fundamental procedural error functionally depriving defendant of his right to judicial review; and (2) defendant was actually prejudiced as a result. *See Santos–Vanegas,* 878 F.2d at 250–51; *United States v. Polanco–Gomez,* 841 F.2d 235, 236–37 (8th Cir.1988). Defendant bears the burden of producing evidence that the alleged procedural defects in his 1987 deportation hearing functionally deprived him of judicial review.

Even assuming, *arguendo,* that the alleged failure to notify defendant of his right to

---

without some corroboration, the plaintiff's and defendant's versions of the facts are evenly balanced. Thus, the plaintiff has failed to carry its

burden of demonstrating its version of the facts by a preponderance of the evidence.

contact the Mexican Consulate was a fundamental error functionally depriving defendant of his right to judicial review,[6] I conclude that defendant was not actually prejudiced as a result. "Actual prejudice" is not a self-defining term in this context, and the Eighth Circuit has not found occasion to clearly define it. In *Santos–Vanegas*, defendant, an immigrant previously deported to his native El Salvador, was later arrested for the felony of unlawful reentry into the United States after deportation in violation of 8 U.S.C. § 1326. Santos–Vanegas moved to suppress evidence of his prior deportation on the grounds that the immigration law judge ("ILJ") who entered the deportation order had not advised him of his right to appeal to a federal court and had applied an incorrect legal standard with regard to his political asylum application. Addressing the actual prejudice element, the Eighth Circuit concluded that the ILJ's failure to apprise Santos–Vanegas of his opportunity for judicial appeal and the ILJ's application of an incorrect legal standard "may well have resulted in a deportation that would not otherwise have occurred." *Id.* at 251. Specifically, the Eighth Circuit concluded that had Santos–Vanegas' political asylum claim been evaluated using the correct, "less exacting" legal standard, "it seems quite possible that Santos–Vanegas could have succeeded in showing a well-founded fear of persecution [thereby entitling Santos–Vanegas to have his deportation withheld]." *Id.* at 252. Thus, while Santos–Vanegas was not required to

---

**6.** This assumption concedes a major element to the defendant. In *Mendoza–Lopez*, the defendant was deported after a mass hearing at which the ILJ did not ensure that each detainee understood his/her rights. The Eighth Circuit concluded that a defendant was entitled to collaterally attack the prior deportation because a prior lawful deportation was an essential element of a violation of 8 U.S.C. § 1326. *See United States v. Mendoza–Lopez*, 781 F.2d 111, 112 (8th Cir. 1985). The Supreme Court disagreed, concluding that section 1326 did not require that the prior deportation be lawful. *See Mendoza–Lopez*, 481 U.S. at 834–37, 107 S.Ct. at 2152–55. The Court went on to hold, however, that constitutional due process required that a defendant be able to collaterally attack a prior deportation resulting from a fundamentally unfair deportation proceeding that deprived him of judicial review of the deportation order. *Id.* at 837–41, 107 S.Ct. at 2154–57. As the Court explained:

> Our cases establish that where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be some meaningful review of the administrative proceeding. *See Estep v. United States*, 327 U.S. 114, 121–122, 66 S.Ct. 423, 427, 90 L.Ed. 567 (1946); *Yakus v. United States*, 321 U.S. 414, 444, 64 S.Ct. 660, 677, 88 L.Ed. 834 (1944); *cf. McKart v. United States*, 395 U.S. 185, 196–197, 89 S.Ct. 1657, 1664–1665, 23 L.Ed.2d 194 (1969). This principle means at the very least that where the defects in an administrative proceeding foreclose judicial review of that proceeding, an alternative means of obtaining judicial review must be made available before the administrative order may be used to establish conclusively an element of a criminal offense. The result of those proceedings may subsequently be used to convert the misdemeanor of unlawful entry into the felony of unlawful entry after a deportation. Depriving

an alien of the right to have the disposition in a deportation hearing reviewed in a judicial forum requires, at a minimum, that review be made available in any subsequent proceeding in which the result of the deportation proceeding is used to establish an element of a criminal offense.

*Id.* at 837–38, 107 S.Ct. at 2155 (footnotes omitted). Thus, not all due process errors during a deportation proceeding—only those fundamental procedural errors that functionally deprive the alien of judicial review—may serve as a basis for collaterally attacking the proceeding. The Court explicitly declined to enumerate such fundamental procedural errors:

> We decline at this stage to enumerate which procedural errors are so fundamental that they may functionally deprive the alien of judicial review, requiring that the result of the hearing in which they took place not be used to support a criminal conviction. We have previously recognized, however, in the context of criminal proceedings, that "some errors necessarily render a trial fundamentally unfair," *Rose v. Clark*, 478 U.S. 570, 577, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986) (use of coerced confession, adjudication by a biased judge); *see also Rose v. Lundy*, 455 U.S. 509, 543–544, 102 S.Ct. 1198, 1216–1217, 71 L.Ed.2d 379 (1982) (STEVENS, J., dissenting) (mob violence, knowing use of perjured testimony). While the procedures required in an administrative proceeding are less stringent than those demanded in a criminal trial, analogous abuses could operate, under some circumstances, to deny effective judicial review of administrative determinations.

*Id.* at 838 n. 17, 107 S.Ct. at 2155 n. 17. I do not address whether the failure to notify defendant of his right to contact the Mexican Consulate was such a fundamental procedural error as envisioned by the Court, because given my finding of no prejudice, it is not necessary to do so.

show that he would have actually prevailed on his deportation challenge, the Eighth Circuit nevertheless appeared to envision a *specific course of action or relief* denied Santos–Vanegas as a result of the alleged fundamental procedural error.

The Eleventh Circuit, which requires a similar "actual prejudice" element to collaterally challenge a prior deportation proceeding, has held that while a defendant need not prove that he would not have been deported had the errors in the proceeding been cured, he must at least demonstrate that the errors affected the outcome of the hearing. *See United States v. Holland,* 876 F.2d 1533, 1536 (11th Cir.1989).

The Ninth Circuit applied a similar standard in *United States v. Rangel–Gonzales,* 617 F.2d 529 (9th Cir.1980), the primary case relied upon by the defendant for relief here. Like the present case, in *Rangel–Gonzales* the defendant in a section 1326 unlawful reentry criminal proceeding challenged his prior deportation hearing for an alleged failure of the INS to advise him of his right to consult with Mexican Consular authorities. The trial court dismissed the indictment on that basis. On appeal the Ninth Circuit remanded with instructions that the trial court consider whether the violation had prejudiced the interests of the defendant protected by the regulation requiring that defendant be advised of his right to contact the consulate. On remand the trial court found no prejudice, and defendant appealed. The Ninth Circuit first reiterated the prejudice standard provided to the district for remand:

> On remand the aliens should be allowed the opportunity to demonstrate prejudice resulting from the INS regulation violations. The district courts will determine whether violation of 8 C.F.R. § 242.2(e) harmed the aliens' interests in such a way as to affect potentially the outcome of their deportation proceedings. *Any such harm should be identified specifically.*

*Id.* at 530 (emphasis added) (quoting *United States v. Calderon–Medina,* 591 F.2d 529, 532 (9th Cir.1979)). The court then stressed that the initial burden for producing evidence showing prejudice is on the defendant. *See*

*id.* The court then assessed the evidence submitted by defendant as follows:

> The evidence presented by the defendant in support of his claim of prejudice took the form of several affidavits. Defendant's own affidavit stated that he did not know he had a right to consult with the Mexican Consulate, and that he believed that he would have contacted the Mexican Consulate had he known he could do so. The affidavit of the Mexican Consul General in Seattle stated that his office would visit an alien who called for help, would help him contact friends and an attorney, and might even send a Consular representative to the deportation hearing. The affidavit of an experienced immigration attorney stated that an individual in Rangel's position could, with appropriate assistance, have obtained voluntary departure rather than deportation. Affidavits from various family members and legal and social service groups stated that had they known of the appellant's difficulties they would have been of assistance to him.
>
> We conclude that these affidavits made a prima facie showing of prejudice within the meaning of [*United States v. Calderon–Medina,* 591 F.2d 529 (9th Cir.1979)]. The appellant showed he did not know of his right to contact the consular officials, that he would have done so had he known, and that such consultation may well have led not merely to appointment of counsel, but also to community assistance in creating a more favorable record to present to the immigration judge on the question of deportation. The appellant did show some likelihood that had the regulation been followed his defense and the conduct of the hearing would have been materially affected.

*Id.* at 531. The court then assessed two affidavits submitted by the government in rebuttal, concluding that they did not rebut defendant's prima facie showing of prejudice. *See id.*

In the present case defendant has not made an analogous evidentiary showing. Defendant's evidence in support of his alleged prejudice consists of defendant's testimony that he would have sought assistance from

the consulate, and an affidavit of Juan Salgado, Deputy Consul of the Mexican Consulate. In his affidavit Salgado outlines the general duties of the Mexican Consulate, as well as the specific services the Consulate "will attempt to provide ... to the Mexican National." (Defendant's Exhibit 2, at 2.) Salgado concludes that

> The assistance described above may have been unusually helpful [in defendant's case], because [defendant] cannot read English or Spanish, and, therefore, could not have understood any written document shown to him by the Immigration and Naturalization Service or the Immigration Law Judge at or prior to the deportation hearing.
>
> It is my opinion, based on my review of the facts surrounding [defendant's] deportation, that if [defendant] would have had access to the assistance, which is routinely provided to Mexican nationals facing deportation, there is a likelihood that the assistance would have materially affected [defendant's] possibility of obtaining a voluntary departure.

(*Id.*)

Neither Salgado nor defendant has explained what specific relief or action the consulate would have provided had defendant been advised of his right to contact the consulate. At the hearing on this suppression motion defendant argued that the Attorney General would have had discretion to suspend defendant's deportation under section 244 of the Act, 8 U.S.C. § 1254(f)(3) (1987), and thus the consulate could have "stepped in and provided assistance" to defendant in his efforts to seek such discretionary suspension.[7] While it does appear that at the time of his 1987 deportation hearing defendant was entitled to discretionary suspension of

deportation by the Attorney General pursuant to 8 U.S.C. § 1254(f)(3) (1987) since defendant was a native of Mexico, "a country contiguous to the United States," Salgado does not address the issue of discretionary suspension in his affidavit. Rather, Salgado refers to voluntary departure—an entirely separate basis for relief under the Act. *Compare* 8 U.S.C. § 1254(a) (suspension of deportation) *with* 8 U.S.C. § 1254(e) (voluntary departure). Moreover, Salgado does not explain what specific services or action the consulate would have provided or pursued that would have "materially affected [defendant's] possibility of obtaining a voluntary departure" under the Immigration and Nationality Act. (Defendant's Exhibit 2, at 2.) For example, it is unclear what specific aspect/s of the Attorney General's discretion (either with respect to suspension of deportation or voluntary departure) the consulate would have been able to "assist" in facilitating had defendant contacted him. I conclude that defendant has failed to produce sufficient evidence demonstrating actual prejudice as a result of the INS failure to inform him of his right to contact the Mexican Consulate. That is, defendant has failed to produce sufficient evidence showing how, specifically, the consulate's assistance would have actually affected the outcome of his deportation proceedings. Accordingly, I shall recommend denial of defendant's motion to suppress with respect to his collateral challenge of his 1987 deportation hearing.

**IT THEREFORE HEREBY IS RECOMMENDED** to the Honorable Richard G. Kopf, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B), that defendant's motion (filing 15) be granted with respect to his *Miranda* claims, and denied with respect

---

7. The relevant language of section 244 provides:

> No provision of this section (244—Suspension of Deportation) shall be applicable to an alien who ... (3) is a native of any country contiguous to the United States ... Provided, That the Attorney General may in his discretion agree to the granting of suspension of deportation to an alien specified in clause (3) of this subsection if such alien establishes to the satisfaction of the Attorney General that he is ineligible to obtain a non-quota immigrant visa.

8 U.S.C. § 1254(f)(3) (1987). Thus, to be eligible for this discretionary suspension of deportation, defendant is required to show that he was ineligible for a non-quota immigrant visa. *See Blanco-Dominguez v. Immigration and Naturalization Service*, 528 F.2d 382, 383 (9th Cir.1975). Defendant appears to argue that he is ineligible for a non-quota immigrant visa based on section 212(a) of the Act, 8 U.S.C.A. § 1182(a)(2) (criminal and related grounds), in light of his 1985 conviction for transporting/selling a controlled substance.

to his collateral challenge to his 1987 deportation hearing.

The parties are notified that unless objection is made within ten days after being served with a copy of this recommendation, they may be held to have waived any right they may have to appeal the court's order adopting this recommendation.

Dated September 8, 1994.